**In the Matter of the WELFARE OF the Child of M.K. and T.K., Parents.**

Nos. A11–553, A11–554.

Court of Appeals of Minnesota.

Sept. 6, 2011.

James Martin, Martin Law Office, Faribault, MN, for appellant T.K.

Carl Arnold, Arnold Law & Mediation L.L.C., Northfield, MN, for appellant M.K.

G. Paul, Beaumaster, Rice County Attorney, Catherine M. Miller, Assistant County Attorney, Faribault, MN, for respondent County.

Alexander De Marco, Public Defender's Office, Owatonna, MN, for respondent C.K.

Candice Duncan, Faribault, MN, guardian ad litem.

Considered and decided by KLAPHAKE, Presiding Judge; STONEBURNER, Judge; and SCHELLHAS, Judge.

## OPINION

STONEBURNER, Judge.

In these consolidated appeals, appellants, parents of a child alleged by respondent county to be a child in need of protection or services (CHIPS), challenge the juvenile court's denial of their timely motions to void or permit them to withdraw admissions to the CHIPS petition. Parents argue that (1) their admissions are void because they were not made under oath; (2) they are entitled to withdraw the admissions under Minn. R. Juv. Prot. P. 35.03, subd. 5(a), to correct a manifest injustice because they did not understand what they were admitting; and (3) the record does not support their admissions.

## FACTS

In November 2010, C.K., the son of appellants M.K. (mother) and T.K. (father), ran away from home. He was found, and a police officer took him home. Because the officer thought that C.K. might be at risk in his home, C.K. was placed on a 72-hour emergency hold. Respondent Rice County, through a social worker, petitioned the juvenile court for a determination that C.K. is a CHIPS based on the statutory grounds provided in Minn.Stat. § 260C.007, subds. 6(3) (child is without necessary food, clothing, shelter, education, or other required care), 6(5) (child is medically neglected), 6(8) (child is without proper parental care because of emotional, mental, or physical disability, or state of immaturity of parents), and 6(9) (child is one whose behavior, condition, or environment is such as to be injurious or dangerous to the child or others) (2010).

A pretrial hearing on the CHIPS petition took place on February 10, 2011. At that time, C.K. was at the Mayo Clinic for a psychiatric evaluation. Parents were present at the hearing, represented by separate counsel. C.K.'s attorney was present and stated that C.K. wanted to participate by telephone, but the record does not reflect that C.K. was contacted during this hearing. The county informed the juvenile court that it had offered to amend the petition to allege, as the statutory basis for a CHIPS adjudication, only

Minn.Stat. § 260C.007, subd. 6(4) (2010) (child is without the special care made necessary by a physical, mental, or emotional condition because the child's parents are unable or unwilling to provide that care). The county stated, without explanation, that if parents did not admit the amended petition, the county would dismiss the petition.

Parents told the juvenile court that they want services for C.K. and agreed with recommendations that they received for C.K.'s out-of-home placement in a specific program, but they strongly objected to allegations in the CHIPS petition that C.K.'s condition and needs are due to any deficiencies in their parenting. Mother asserted that parents would not admit that C.K.'s needs relate to their parenting, stating, "I am a damn good mother." Parents stated that they want to maintain control over C.K.'s treatment.

The county stated that it could not make the treatment placement that parents wanted due to "procedures that it needs to follow regarding [the] least restrictive [setting] and making attempts to try to keep [C.K.] in the community until everything else has failed and we need to place him somewhere else."

The juvenile court told parents that unless they admitted the petition, there would be no discussion about C.K.'s placement, but if they admitted the petition, C.K.'s disposition would be decided by the juvenile court, not parents or the county. The juvenile court stated:

> If you want to admit that your son has special care needs and you're unable to provide those, that is not saying that you're not a good parent. That's saying [C.K.] has special care needs and you're not [the program] or you're not the Mayo Clinic and you're not a psychiatrist or whoever is the appropriate per-

son to give these services, and you can't give them yourself.

> That's not to say that you're not a good parent, or even a damn good parent, as you put it. That's not the issue here.

> . . . .

> But if you aren't going to admit then we aren't going to get to a disposition.

> . . . .

> . . . [W]ithout an admission [the county is] going to dismiss the petition.

> . . . .

> . . . [A]ll that you're admitting, is that [C.K.] has special care needs and that you can't provide them. There . . . is no more . . . .

> . . . .

> I mean there isn't any "and" to that, it's just that [C.K.] has special needs and you can't provide for them.

> . . . .

> . . . [a]nd that's all we're talking about is [C.K.] has special needs and you can't provide for those needs.

The county concurred with the juvenile court's explanation of the nature of the statutory ground it proposed to support a CHIPS adjudication. Mother said, "I'd admit to that then."

Father had additional questions about what would happen if he admitted to the petition, questioning why the county was not willing to follow the recommendations for C.K.'s placement. The juvenile court said, "Well, we're not going to get to the disposition hearing unless you admit." Whereupon father said, "I'd admit." Neither parent had been placed under oath, and there was no discussion or explanation about why the admissions necessitated protection or services of the court. Based on parents' admissions, the juvenile court found that C.K. met the definition of a CHIPS under Minn.Stat. § 260C.007,

subd. 6(4), and the county dismissed the original allegations in the petition.

On February 15, 2011, the juvenile court issued a written order adjudicating C.K. a CHIPS, finding, in relevant part, that the parents admitted the amended petition and that "[t]he parents strongly feel that [C.K.] needs mental health intervention and treatment and they do not have the resources to provide that treatment." The juvenile court did not state any other factual basis for parents' admissions.[1] The juvenile court found that:

> [T]his case has been very contentious, and this appears to stem from a belief on the part of the parents that they are entitled to absolute direction over [C.K.]'s care even when they have asked for the County's assistance in providing that care. Rice County Social Services is obligated to abide by numerous policies and regulations in the performance of its duties, and so long as the agency continues to provide services, there will be times when the parents must defer to the agency's decisions. It is in [C.K.]'s best interests for the parents to work amicably with Rice County Social Services to facilitate the provision of those services in mutual pursuit of the best outcome for [C.K.].

On February 22, 2011, father's attorney filed a letter with the juvenile court, stating that father wanted to withdraw his admission based on his belief that "he was misled as to the availability of programming without an admission." The following day, mother moved the juvenile court for an order (1) voiding both parents' admissions because they were not under oath

as required by Minn. R. Juv. Prot. P. 35.03, subd. 1; (2) permitting parents to withdraw the admissions under Minn. R. Juv. Prot. P. 35.03, subd. 5(a), to correct a manifest injustice; (3) dismissing the petition; and (4) granting other relief found just and equitable. The motion was supported by mother's affidavit stating that neither she nor father was sworn prior to their admissions, that she felt pressured to admit, and that she believed that voiding the admissions "would correct a manifest injustice of the county bringing this case under 260C instead of 260D since the case is about our child's needs rather than our parental inability." On February 24, father filed a motion to withdraw his admission. Father's motion does not state a basis for withdrawing the plea and has no supporting attachments.

The motions, opposed by the county, were heard on February 25, 2011. C.K. was present with counsel, but took no position on the motions. In addition to arguing that the admissions were void for lack of oaths, parents, noting the complexity of child-protection laws, argued that they misunderstood the ramifications of the admissions and did not believe that a CHIPS action is appropriate in this case. The county argued that parents were not denying that C.K. needs services that they cannot provide. The county stated, "260D cases are for placements when the child is placed solely out of home for his or her emotional disturbance or developmental disability. That is not the case here." The county then recited the allegations against parents contained in the original petition, all of which had been dismissed by the county.[2] Despite the parents' ad-

1. The only finding related to C.K. in the juvenile court's order adjudicating him a CHIPS is that C.K. "is in foster care following an Emergency Protective Care hearing on January 11, 2011, at which time the court found a *prima facie* basis for the Petition, and that,

based on the Petition, the child would be immediately endangered if released to the custody of his parents."

2. The dissent similarly relies extensively on allegations that were dismissed by the county

mission that placement was based solely on C.K.'s needs, the county now asserts that C.K.'s placement was necessary to keep him safe from his parents and that there is, in this case, a family component "that has to be done and that is not something that is done in a 260D petition."

The juvenile court denied parents' motions to withdraw their admissions, stating that it did not see a manifest injustice to parents; it found no reason to doubt the veracity or sincerity of the admissions despite the lack of an oath; and withdrawal of the admissions would not be in the child's best interests.

The county then suggested that disposition could take place immediately based on the county's recommendations for placement. But parents did not agree with the county's recommendations, which included programming for parents.

A disposition hearing took place on March 18, 2011. The resulting disposition order (1) maintains the county's custody of C.K. for placement in foster care and transfer to residential treatment when available; (2) requires mother to complete a parenting assessment and follow recommendations; (3) requires both parents to participate in parenting education and family-skills programming when C.K. returns home, and to cooperate with ongoing relative searches and programming and planning for C.K.; (4) requests that parents and the county jointly decide on the appropriate educational setting for C.K.; and (5) requires C.K. to have a psychological evaluation on admission to residential treatment, to follow treatment recommen-

dations, to participate in individual therapy and medication management with a psychiatrist, and to abide by the rules of any foster home, school, or program in which he is enrolled.

On March 22, 2011, mother appealed the juvenile court's denial of her motion to withdraw her admission.[3] On the same day, father filed a similar appeal.[4] This court consolidated the appeals for review.

## ISSUES[5]

I. Did conditioning delivery of needed services to a child on parents' admissions to a CHIPS petition constitute a manifest injustice?

II. Did the mischaracterization of the nature of the statutory grounds for a finding that C.K. is a CHIPS and the absence of evidence establishing the need for protection or services entitle parents to withdraw admissions to CHIPS petition to correct a manifest injustice?

III. Does the absence of an oath void an admission to a CHIPS petition?

## ANALYSIS

**I. Coercing parents to admit to a CHIPS petition constitutes a manifest injustice, entitling parents to withdraw their admissions under Minn. R. Juv. Prot. P. 35.03, subd. 5(a).**

 Parents argue that withdrawal of their admissions is necessary to correct a manifest injustice. Minn. R. Juv. Prot. P. 35.03, subd. 5(a), provides that an admis-

---

and, therefore, were never proved or admitted.

3. File No. A11–553.

4. File No. A11–554.

5. We have stated the issues differently than as stated in the parties' briefs because we conclude that the issues, as reframed, were implicit in parents' motions and are implicit in parents' appeals, and because we have the discretion to address issues as justice requires under Minn. R. Civ.App. P. 103.04.

sion to a CHIPS petition "may be withdrawn at any time upon a showing that withdrawal is necessary to correct a manifest injustice." This court reviews a juvenile court's denial of a motion to withdraw an admission under Minn. R. Juv. Prot. P.35.03, subd. 5(a), for an abuse of discretion. *In re Welfare of Children of M.L.A.*, 730 N.W.2d 54, 60 (Minn.App.2007).

■ "Manifest injustice" is defined as "[a] direct, obvious and observable error in a trial court, such as a defendant's guilty plea that is involuntary or is based on a plea agreement that the prosecution has rescinded." *Black's Law Dictionary* 1048 (9th ed.2009). In *M.L.A.*, this court concluded that coercing a parent to admit to a termination-of-parental-rights (TPR) petition by threatening that failure to admit the petition would result in a placement of the children that is contrary to their best interests constitutes manifest injustice under Minn. R. Juv. Prot. P. 35.03, subd. 5(a). 730 N.W.2d at 61.[6]

■ In this case, the county, on the record, conditioned provision of services to C.K. on parents' admissions to a statutory basis for a finding that C.K. is a CHIPS. The county did not explain why it was not prepared, absent parents' admissions, to prove the CHIPS petition by clear and convincing evidence so that C.K. could receive the services that the county asserted he needed. On the record, parents objected to admitting any allegation that implicates their parenting and questioned why the county could not assist them in providing services to C.K. without a CHIPS adjudication. Parents were repeatedly told that unless they admitted a statutory basis for a CHIPS adjudication, the county

would not assist in providing services for C.K.

We conclude that the county's position in this case coerced parents' admissions in a manner similar to the coercion alleged by mother in *M.L.A.* Here, as in *M.L.A.*, we conclude that a threat to act in a manner that is not in a child's best interests constitutes a manifest injustice. If the county did not believe that clear and convincing evidence would show that a CHIPS adjudication was in C.K.'s best interests, the county should have dismissed the petition rather than coercing an admission to a statutory basis for the petition. On this record, parents have demonstrated that withdrawal of their admissions is necessary to correct a manifest injustice and they are entitled to withdraw their admissions under Minn. R. Juv. Prot. P. 35.03, subd. 5(a). The juvenile court abused its discretion by denying parents' motions to withdraw their admissions.

**II. The juvenile court and the county misinformed parents of the nature of Minn.Stat. § 260C.007, subd. 6(4), and failed to establish that C.K. is in need of protection or services, making the finding that C.K. is a CHIPS based on parents' admissions manifestly unjust and entitling parents to withdraw their admissions under Minn. R. Juv. Prot. P. 35.03, subd. 5(a).**

■ The juvenile court is required to determine that a person admitting a CHIPS petition "acknowledges an understanding of the nature of the statutory grounds set forth in the petition ... and acknowledges an understanding that the facts being admitted establish the statuto-

6. In *M.L.A.*, the alleged coercion did not take place on the record, and we held that mother was entitled to an evidentiary hearing to determine whether the representations that

mother's affidavit alleged were made and, if so, by whom they were made and what role the representations played in mother's admission to the TPR petition. 730 N.W.2d at 61.

ry grounds set forth in the petition." Minn. R. Juv. Prot. P. 35.03, subd. 3(a)(1)(i). We conclude that the juvenile court and the county mischaracterized the nature of the statutory grounds that parents were required to admit in order to obtain services for their child and that this mischaracterization made acceptance of their admissions manifestly unjust.

■ The juvenile court explicitly told parents that they would be admitting only that C.K. has special needs that parents could not *personally* provide, stating:

> If you want to admit that your son has special care needs and you're unable to provide those, that is not saying that you're not a good parent. That's saying he has special care needs and you're not [the treatment program] or you're not the Mayo clinic and you're not a psychiatrist or whoever is the appropriate person to give these services, *and you can't give them yourself.*
>
> . . . .
>
> That is all that you're admitting, is that he has special care needs and that you can't provide them. . . . There is no more. . . .

(Emphasis added.) The county agreed with this characterization of the nature of the statutory ground asserted in the petition. But this statement would likely apply to any parent of a special-needs child, and it is, therefore, not surprising that both mother and father admitted that they cannot *personally* give C.K. the special care he needs. Minn.Stat. § 260C.007, subd. 6(4), describes parents who cannot or will not provide needed care, and we decline to read the provision to describe parents who cannot *personally* provide needed care. This court will not add statutory requirements that the legislature has purposefully omitted or has inadvertently overlooked. *Green Giant Co. v. Comm'r of Revenue,* 534 N.W.2d 710, 712 (Minn.1995).

Additionally, a finding that a child is a CHIPS cannot be based solely on an admission that one of the statute's enumerated child-protection grounds exists; the statute also requires proof or admission "that the subject child needs protection or services as a result." *In re Welfare of Child of S.S.W.,* 767 N.W.2d 723, 728 (Minn.App.2009) (rejecting a county's assertion that proof of the existence of any of the enumerated child-protection grounds is sufficient to establish that a child is a CHIPS, without regard to the particular circumstances of the case or the individual needs of the child).

The record does not disclose why, in this case, parents' inability to *personally* provide the services C.K. needs requires an adjudication that C.K. is a CHIPS. The juvenile court's written findings state that parents are without the "resources" to provide services for C.K. But there is no evidence in the record to establish that a lack of "resources" requires a CHIPS adjudication.

As mother argued to the juvenile court, parents' admissions more accurately apply to the circumstances of a voluntary out-of-home placement under Minn.Stat. §§ 260D.01–.10 (2010). To explain this conclusion, we must examine the 2008 amendment to Minn.Stat. § 260C.007, subd. 6(4). Prior to the 2008 amendment, a child could be adjudicated a CHIPS under Minn.Stat. § 260C.007, subd. 6(4), if the child was in need of protection or services because the child "is without the special care made necessary by a physical, mental, or emotional condition because the child's parent . . . is unable or unwilling to provide that care, *including a child in voluntary placement due solely to the child's developmental disability or emotional disturbance.*" Minn.Stat. § 260C.007, subd. 6(4) (2008) (emphasis

added). In 2008, the above-italicized language was removed. 2008 Minn. Laws ch. 361, art. 6 § 26 at 1781. At the same time, the legislature enacted the child-in-voluntary-foster-care-for-treatment provisions of the Juvenile Court Act: Minn.Stat. § 260D.01–.10 (2008). 2008 Minn. Laws ch. 361, art. 6, §§ 44–53. Under these provisions, a "child in voluntary foster care for treatment" is defined as "a child who is emotionally disturbed or developmentally disabled or has a related condition and is in foster care under a voluntary foster care agreement between the child's parent and the agency due to concurrence between the agency and the parent when it is determined that foster care is medically necessary" as provided in the statute. Minn. Stat. § 260D.02, subd. 5 (2010). "A child is not in voluntary foster care for treatment under [Minn.Stat. § 260D.01–.10] when ... the child is in foster care for any reason other than the child's emotional or developmental disability or related condition." *Id.* One purpose of the provision for voluntary placement under the provisions of the Juvenile Court Act is

> to ensure the child's parent retains legal custody of the child and associated decision-making authority unless the child's parent willfully fails or is unable to make decisions that meet the child's safety, health, and best interests. The court may not find that the parent willfully fails or is unable to make decisions that meet the child's needs solely because the parent disagrees with the agency's choice of foster care facility, unless the agency files a petition under chapter 260C, and establishes by clear and convincing evidence that the child is in need of protection or services.

Minn.Stat. § 260D.01(e)(3).

In this case, the juvenile court's explanation of the nature of Minn.Stat. § 260C.007, subd. 6(4), did not accurately inform parents that, by admitting the allegation, they would, in fact, be admitting that C.K. was in foster care for reasons not solely related to C.K.'s special needs. The county's agreement with the juvenile court's description of what it was asking parents to admit was disingenuous, as demonstrated by the county's later assertion that C.K. was not placed out of home solely for his needs and that "[t]here is a family component that has to be done and that is not something that is done" under Minn.Stat. §§ 260D.01–.10, where the focus is solely on the needs of the child.

Whether this case is within the scope of Minn.Stat. §§ 260D.01–.10 is not the issue before us, and we make no determination of that issue. We conclude only that what parents were told that they were admitting is consistent with the circumstances for which Minn.Stat. §§ 260D.01–.10 was enacted and is inconsistent with an admission under Minn.Stat. § 260C.007, subd. 6(4). Parents were adamant that they would not admit to any deficiencies in their parenting, and they were assured that their admissions were unrelated to their parenting. Because parents were misled about the nature of their admissions and because there is no proof or admission in the record that what parents actually admitted requires protection or services, we conclude that acceptance of the admissions as a basis for finding that C.K. is a CHIPS created a manifest injustice, entitling parents to withdraw the admissions under Minn. R. Juv. Prot. P. 35.03, subd. 5(a). The juvenile court abused its discretion by denying the motions to withdraw the admissions to correct this manifest injustice.

### III. The juvenile court erred by accepting admissions to the CHIPS petition that were not made under oath, but it is not necessary in this case to determine whether this error voided the admissions.

CHIPS proceedings are governed by the Minnesota Rules of Juvenile

Protection Procedure. Minn. R. Juv. Prot. P. 1.01. Under the rules, "any admission [of the statutory grounds asserted in a CHIPS petition] must be made under oath." Minn. R. Juv. Prot. P. 35.03, subd. 1. "The oath emphasizes the seriousness of an admission and allows the admission to be used in other court proceedings when confidentiality will not be violated, and the court in other proceedings finds the admission admissible." 13 Robert Scott & John O. Sonsteng, *Minnesota Practice* at 404 (3rd ed. Supp.2010–11). There is no dispute that parents in this case did not make their admissions under oath, therefore, the juvenile court erred as a matter of law by accepting parents' unsworn admissions to the CHIPS petition. On appeal, parents argue that the juvenile court's failure to place them under oath renders the admissions void.[7]

■■■ "The authority to regulate the procedures governing judicial proceedings is an inherent judicial power." *In re Child of B.J.-M.*, 744 N.W.2d 669, 673 (Minn. 2008). The supreme court has exercised its "supervisory power prophylactically or in the interests of justice to enforce the procedural rules ... even where no prejudice was suffered by the complaining party." *Id.* (quotation omitted). But this court, as an intermediate-appellate court, does not exercise supervisory powers reserved to the supreme court. *State v. Gilmartin*, 535 N.W.2d 650, 653 (Minn. App.1995), *review denied* (Minn. Sept. 20, 1995). Because we conclude that the record amply supports parents' arguments that withdrawal of their admissions was necessary to correct a manifest injustice,

we reserve for another day the issue of whether the juvenile court's failure to take their admissions under oath, as required by Minn. R. Juv. Prot. P. 35.03, subd. 1, voids the admissions or constitutes a per se manifest injustice.

## IV. The juvenile court's finding that it is not in C.K.'s best interests to allow withdrawal of parents' admissions is not supported by the record.

■■■ The juvenile court found that it is not in the best interests of the child to allow withdrawal of parents' admissions. But the conclusory finding is not based on any evidence in the record. The record demonstrates only parents' commitment to obtaining treatment for C.K. without having to admit deficiencies in their parenting. At the hearing on parents' motions. there was no discussion about C.K.'s continued treatment or how withdrawal of the admissions would affect C.K. C.K. was present with counsel and took no position on the motions. We conclude that the unsupported finding regarding best interests does not support denial of parents' motions. On remand, the juvenile court shall allow parents to withdraw their admissions to the CHIPS petition.

## DECISION

The district court abused its discretion by denying parents' motions to withdraw their admissions to the CHIPS petition.

**Reversed and remanded.**

7. The county argues that this court should decline to address father's arguments on this point because, in the juvenile court, father argued only that lack of an oath deprived the juvenile court of jurisdiction. *See Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn.1988) (stating that this court will generally not consider issues not presented to and considered by the district court). But mother raised the issue as to both parents and the juvenile court considered the argument with regard to both parents. On this record, we conclude that the issue as to both parents was preserved for appeal.

SCHELLHAS, Judge (dissenting).

The majority reverses the juvenile court, concluding that the court abused its discretion by denying the parents' motions to withdraw their admissions to a petition that alleged that their child, C.K., is a child in need of protection or services (CHIPS). Because I conclude that the juvenile court did not abuse its discretion, I respectfully dissent.

The record before us reveals that this appeal arises out of a clash of the parents' belief that C.K. should be placed at Gerard Academy, a residential treatment facility, at the county's expense with the county's belief that less-restrictive alternatives may be available to meet C.K.'s needs. Additionally, the record reveals that the parents view C.K.'s behavioral problems as stemming solely from his mental-health issues, rejecting any notion that their parental conduct may contribute to his behavioral problems.

After the parents offered their admissions to the CHIPS petition, father's counsel advised the juvenile court in a letter that father wished to withdraw his admission to the CHIPS petition because he believed that "he was misled as to the availability of programming without an admission." Both parents then moved the court for permission to withdraw their admissions on the ground that they did not provide their admissions under oath. At the motion hearing, according to the court, "[the parents] also argued that they did not fully understand the ramifications of the admissions and that the matter should have been brought under Minn.Stat. ch 260D, rather than 260C." As the majority notes, mother supported her motion to withdraw with an affidavit in which she characterized the manifest injustice as "the county bringing this case under 260C instead of 260D since the case is about our child's needs rather than our parental inability."

On appeal, the parents make no argument that the county should have brought a proceeding under chapter 260D, instead of 260C. The record in this case and the language of Chapter 260D suggest that the parents' abandonment of that argument is for good reason.[8] The record in this case contains no evidence that the county and parents agreed about C.K.'s treatment needs or that C.K. met the qualification criteria for treatment under chapter 260D. Nothing in chapter 260D creates an entitlement for a parent to demand that the county agree to voluntary foster care and treatment or to acquiesce to a form of treatment unilaterally chosen by the parents. And chapter 260D "does not apply . . . when the child is in foster care for any reason other than treatment for the child's emotional disturbance or developmental disability or related condition." Minn.Stat. § 260D.01(d) (2010). Indeed, in the ab-

---

8. Minnesota Statutes, chapter 260D governs children who are in foster care for treatment. Section 260D.01(c)(1) (2010) provides that this chapter "establishes voluntary foster care through a voluntary foster care agreement as the means for an agency and a parent to provide needed treatment when the child must be in foster care to receive necessary treatment for an emotional disturbance or developmental disability or related condition." Chapter 260D

applies to voluntary foster care when the child's parent and the agency *agree* that the

child's treatment needs require foster care either:

(i) due to a level of care determination by the agency's screening team informed by the diagnostic and functional assessment under section 245.4885; or

(ii) due to a determination regarding the level of services needed by the responsible social services' screening team under section 256B.092, and Minnesota Rules, parts 9525.0004 to 9525.0016.

Minn.Stat. § 260D.01(c)(4) (2010) (emphasis added).

sence of an agreement between the county and the parents of a child, who needs treatment for an emotional disturbance or developmental disability or related condition, section 260D.01(d) provides that the provisions of chapter 260C apply.

> When there is a determination under section 626.556 that the child requires child protective services based on an assessment that there are safety and risk issues for the child that have not been mitigated through the parent's engagement in services or otherwise, *or when the child is in foster care for any reason other than the child's emotional disturbance or developmental disability or related condition, the provisions of chapter 260C apply.*

*Id.* (emphasis added).

On appeal, father argues that the juvenile court erred by denying his motion to withdraw his admission because he did not give it under oath and he "did not have the benefit of a subsequent objective judicial evaluation of whether the facts that he was admitting to constituted a knowing and intelligent admission and waiver." Mother argues solely on appeal that the court erred by denying her motion to withdraw her admission because she did not give it under oath.

### The CHIPS Petition

When C.K. ran away from home for the second time since November 10, 2010, police attempted to return him without success. Instead, they placed C.K. on a 72–hour hold because of father's visible anger and father's physical abuse of C.K. on May 6, 2009. In connection with the May 6 incident of abuse, father was charged with malicious punishment of a child and placed on probation by the district court on October 29, 2009. After police placed C.K. on the 72–hour hold, the parents allegedly told Rice County that they did not want him back in their home, and C.K. ex-

pressed fear of returning home. Rice County therefore filed a CHIPS petition. Of significance is the fact that the county primarily filed the CHIPS petition because C.K. ran away from home due to fear of his father and because the parents did not want him returned to their home.

The CHIPS petition alleges, among other things, that C.K. had run away twice since November 10, 2010, due to fears of being punished. The second incident occurred after C.K. got into trouble at school "Instead of going home after school, [C.K.] went to a friend's home where he told the friend's mother that he was afraid to go home. The friend's mother contacted law enforcement for a report of possible child abuse." The police responded and learned that the parents "no longer want him in the home because of his behaviors," that C.K. "does not want to return home because of fear of his father being angry and hurting him" and that when police attempted to return C.K. to his home after he ran away, C.K. told police that "he was afraid to go home and [father] had a tendency of losing his temper and throwing or biting him."

The CHIPS petition also alleges that C.K.'s foster father reported to the county that C.K. had been without his ADHD medication for seven days even though the foster mother had informed C.K.'s mother seven days earlier of the need for medication. The foster parents never heard from mother. When the county spoke with father about C.K.'s medication, he said that he would go to C.K.'s school every morning to give C.K. his medication. When the county inquired about the medication prescribed for the afternoon and evening, father stated that C.K. did not need the medication. When the county asked father whether that was consistent with a doctor's order, father stated that it did not matter because C.K. never took

the medication when he was home. C.K.'s school principal reported to the county that when father came to C.K.'s school in the morning to give him his medication, C.K. became upset. The principal opined that it was not a good idea for C.K.'s father to come to C.K.'s school every morning to give C.K. his medication because of how C.K. had reacted to his father.

The CHIPS petition also alleges that mother came to the foster parents' home upset, claiming that "she had learned that [C.K.] created a Facebook page and had threatened a girl" and that "[C.K.] was on an internet porn site." When the foster father looked at C.K.'s Facebook page, he could not see anything that C.K. had done wrong.

The CHIPS petition also alleges that, when the county spoke with father to obtain names of family and friends who could participate in a family group conference, father named only two doctors who could or would attend.

The CHIPS petition also alleges that after police placed C.K. on the 72–hour hold, C.K.'s siblings told their parents that C.K. is mean to them when they are left in his care and this upset the parents very much. The county alleged that the parents appeared unable to provide the "adequate supervision [C.K.] needs," noting that he was left to watch his siblings, which was no longer appropriate. The county also alleged that the parents did not believe that a therapist would help and that "they have tried everything." But, according to the CHIPS petition, contrary to trying "everything,"

> [t]he only services that were found to have been used [by the parents] were a psychiatrist for about one year and skills work with Fernbrook Family Center that was terminated by the parents. The only on-going service that is still in

place is the medication management with Dr. Logan at Mayo Clinic where [C.K.] meets with her once every three months.

The CHIPS petition summarizes the county's provision of reasonable efforts to prevent out-of-home placement, as follows: "family therapy, individual therapy, skills worker, medication management, case management services, and Voluntary Placement for Treatment."

C.K.'s parents objected to various allegations in the CHIPS petition and developed strong disagreement with Rice County about their role in assessing C.K.'s mental-health needs and appropriate services to meet his needs.

### Order for Immediate Custody

On January 7, 2011, the juvenile court issued an order for immediate custody of C.K., concluding that for C.K. to remain in his parents' custody was contrary to his welfare because (1) C.K. had "run out of his medications at his foster home and his parents [were] refusing to provide the medication to the foster parents," and (2) "[C.K.] was placed on a 72 hour hold recently because of the father's visible anger with him after taking an I-pod. The parents were very upset and stated they did not want [C.K.] back in the home. [C.K.] also did not want to return as he feared for his safety."

The order states that "[C.K.] is in such conditions or surrounding that his welfare requires his custody be immediately assumed by the Court as remaining in the custody of his parents is contrary to [C.K.'s] welfare."

### Emergency–Protective–Care Hearing

On January 11, C.K. appeared with counsel at the emergency-protective-care hearing, and his parents appeared without counsel. According to the juvenile court's order issued after the hearing, father dis-

puted that the county had "offered any of the services listed in the [CHIPS] petition." Father claimed that the parents had "applied to the [county] in early November 2010 for services, but that the [county] did not open a case until early December 2010." Mother "indicated [that] she wants [C.K.] to be at home" but "does not believe that it would be in [C.K.'s] best interests to be returned to [the parents'] home at this time." C.K. "indicated that he wishes to return to his parents' home, but understands that there are some unresolved issues in the home." C.K.'s guardian ad litem (GAL) agreed that it was in C.K.'s best interests to remain in foster care.

C.K. is a teenager. By the time of the emergency-protective-care hearing, C.K. wanted to return home, but recognized that there were unresolved issues *in the home,* and the GAL did not support C.K.'s return home. Nothing in the record suggests that, at the time of the emergency-protective-care hearing, C.K.'s mental health precluded his return home.

The juvenile court concluded that the CHIPS petition made a prima facie showing that a juvenile protection matter existed and that C.K., born April 24, 1997, was the subject of the matter. Among other provisions in its order, the court "placed [C.K.] *in the temporary legal and physical custody of Rice County Social Services* for placement in licensed foster care," granted the parents supervised visitation with C.K., and set an admit/deny hearing for January 20. (Emphasis added.)

On January 12, the juvenile court issued an order appointing counsel for each parent.

*Admit/Deny Hearing*

At the admit/deny hearing on January 20, the parents appeared with court-appointed counsel and entered denials to the CHIPS petition. The parents did not object to C.K. continuing in foster care, but they requested unsupervised visitation with him. The county opposed unsupervised visitation because of reports that "the parents had been speaking inappropriately with [C.K.] about this proceeding, including suggesting that [C.K.] was at fault." And C.K.'s GAL "supported supervision of visits based on concerns for [C.K.'s] safety given the allegations about the father's problems with anger management." The court ordered that "[C.K.] remain *in the temporary legal and physical custody of Rice County Social Services for placement in licensed foster care,*" denied the parents' request for unsupervised visitation, and scheduled a pretrial and trial. (Emphasis added.)

*Pretrial*

The parents appeared with counsel at a pretrial on February 10 with counsel. The pretrial transcript suggests that the parties had discussions off the record before going on the record. Early in the pretrial, C.K.'s counsel informed the juvenile court that the hearing "is just going to be an admit." But the county attorney stated that she understood that the parents "are not willing to admit to the amended petition[9] at this time," and "if that's the case, then the County will be dismissing the petition and request that custody be transferred back to [the parents] forthwith." Both parents then told the court that they wished to be heard before the court made a decision. When the court tried to make a statement—"Well, you would enter an

---

**9.** The record appears to suggest that the county would amend the CHIPS petition to make the statutory allegations less objectiona-
ble to the parents, but the record is not clear on this issue.

admission or denial"—mother interrupted, stating:

> Okay. We don't know right now. Okay. And I don't want that to be taken as a denial. There has been multiple changes in this case since the last time you have seen us and we would like those to be heard and then from there, maybe we would decide.

When the juvenile court inquired about the changes to which mother referred, mother explained that C.K. was "in Rochester Mayo in the mental health unit getting a psych evaluation done," and that "we have right now two recommendations stating that it would be good for [C.K.] to go to Gerard." The parents were adamant that C.K. should be placed in residential treatment at Gerard (at the county's expense). Mother stated:

> [T]hat's the whole reason why we went to the county for help in the first place. We have been having issues that we cannot control in the home anymore and we need extra help for him.
>
> . . . .
>
> So we went to the County in November with all of this. The case was opened up dealt with in December, he ran away—*none of that really even matters right now.*
>
> *What matters is that we went to the county for help to get him some help.* And we have two recommendations, one from a counselor and one from a doctor at Mayo stating that Gerard would be a good fit for him. Okay.
>
> He is now getting evaluated at Mayo. He has a team of doctors that is working with him. From what we understand from talking with them yesterday—we have been in contact every single day, he was admitted last Friday. The evaluation will not be completed until probably Tuesday or Wednesday.
>
> . . . .

> What we do not understand and what we are so frustrated with is why we can have so many recommendations telling us what to do with our child and Social Services is saying no.

(Emphasis added.) Mother went on to explain to the court that the social worker brought "it," presumably referring to placement at Gerard, to "her preservation committee board," and the board said no.

Recognizing that mother's comments revealed concerns about matters relevant to disposition, and recognizing that the county had not acquiesced to the parents' demand for residential treatment for C.K. at Gerard, and recognizing that the county intended to dismiss its petition unless the parents entered admissions to the amended petition, the juvenile court attempted to explain to mother that placement at Gerard was a disposition matter, which the court would not reach unless the parents admitted the petition. The court explained to mother in father's presence:

> You're free to do whatever you need for your son. I think the County is taking the position, and correct me if I'm wrong, [county attorney], but I think the County is taking the position that if you want to do an admission they're going to work with what is best for your son.
>
> But if you're not going to do an admission, they're going to dismiss the case[.] [T]hen you can do what you think is best for your son on your own.

In response to the juvenile court's statements, mother told the juvenile court: "We can't do it on our own without them."

The juvenile court's statements to mother were accurate and not misleading. *See* Minn.Stat. § 260C.193, subd. 1 (2010) (stating that "[w]henever the court finds that the minor is not within the jurisdiction of the court or that the facts alleged in the

petition have not been proved, it shall dismiss the petition"). If a county chooses not to prosecute a CHIPS petition, the facts alleged in the petition are not proved, and a court "shall dismiss the petition." *Id.*

Here, the county attorney explained the county's position on the record:

> [T]he offer for settlement today was that they would admit under paragraph 4 and I would amend the petition to add that
>
> . . . .
>
> paragraph that [C.K.] is without special care, made necessary because of his physical, mental, or emotional condition, and the parents are unable to provide him that care.
>
> And it seems clear to me that they agree that they can't care for [C.K.] right now, that he needs some treatment to help him return to the home.
>
> There's a disagreement as to what type of treatment he needs. Whether we can try something less restrictive rather then going right to Gerard. Which I, you know, I talked to the parents' attorneys about that and it could be something that could be argued at disposition that the Court could decide what it believes is best.
>
> But it's my understanding that they don't want to admit to that, which means then they're freely welcome to go to Gerard and place him at Gerard themselves. If they want to do that there's nothing the County can do to stop them and they can truly do this on their own.
>
> But the County has procedures that it needs to follow regarding least restrictive and making attempts to try to keep him in the community until everything

else has failed and we need to place him someplace else.[10]

> *And that's where the dispute is.*

(Emphasis added.) This record strongly suggests that the county was willing to proceed with the CHIPS petition in order to assist the parents and C.K. with services to address the family's problems but that the county was not willing to proceed without the parents' cooperation or simply to provide funding for C.K.'s residential treatment at Gerard. Without the parents' cooperation, to be evidenced by their admission to the amended CHIPS petition, the county appears to have made a determination that it would not continue its involvement. The reasonableness of the county's position in this case must be considered in light of the entire record and circumstances of the case, including the age of the child.

Following the county attorney's statements, mother said:

> I'll tell you right now the dispute that both of us have, I can speak on behalf of my husband on this, *the only thing that we do not agree to in that paperwork which we have been told is kind of you can't get rid of it—we want control over what happens to [C.K.].* I don't want the County—we're not stating to the County that we are unfit parents, I am a damn good mother.

(Emphasis added.) Mother's comments clearly reflect that she and her husband had been told that, if they made any admissions to the CHIPS petition, they would lose control over the services provided to C.K., i.e., his treatment—the disposition. As mother stated, that was "the only thing that we do not agree to." But she acknowledged that she and her hus-

---

10. At the time of the pretrial hearing on February 10, 2010, the county's mental-health team, comprised of mental-health professionals and social workers, had not reached a conclusion about appropriate services for C.K.

band had been told that "you can't get rid of it."

Mother's communications to the juvenile court evidence her attempts to persuade the court to agree that C.K. would be placed in residential treatment at Gerard, if she admitted the CHIPS petition. The record reflects the juvenile court's appreciation of the parents' position, and, contrary to misleading the parents, the court disabused mother of the idea that if the parents entered admissions to the CHIPS petition, C.K. would be placed at Gerard. The court stated:

> You don't tell the County what to do. I tell you and the County what to do, if you want to get to the bottom line.
>
> . . . .
>
> The issue is there's special needs, and if you want to admit then we would have a hearing concerning disposition, and ultimately I have to make that decision. And frankly it isn't always very easy. But you have a right to tell me whatever it is that you want to tell me prior to that disposition, as does your husband, and as does the County
>
> . . . . And then I would make that decision.
>
> . . . [T]his is kind of a contest of wills between you and the County as to who's going to determine the care for your son. And we haven't gotten to that stage yet.
>
> If you don't admit, the case goes away, and you're free to do whatever you want.
>
> And I understand that you may be talking about some kind of care that's very expensive, and without insurance covering it probably the average person couldn't afford it.
>
> But if you aren't going to admit then we aren't going to get to a disposition.
>
> . . . .

So I can continue this hearing if you want more time to talk to your attorneys and decide what you want to do. But I think the county has made its position clear, that without an admission they're going to dismiss the petition.

With the advice of counsel, both parents offered admissions to the amended petition. I do not agree that the record supports a conclusion that the parents were coerced into making their admissions. The district court considered all of the parents' arguments in connection with their motions to withdraw their admissions, and, in my opinion, properly rejected their arguments and denied their motions.

I would affirm.