*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A16-0309
A16-0310**

In the Matter of the Welfare of the Children of: M. A. K. and A. L. P., Sr., Parents

**Filed June 27, 2016
Affirmed in part, reversed in part, and remanded
Larkin, Judge**

Benton County District Court
File Nos. 05-JV-15-2308, 05-JV-15-705

Thomas E. Kramer, Kramer Law Office, St. Cloud, Minnesota (for appellant-mother M.A.K.)

Cathleen Gabriel, CGW Law Office, Annandale, Minnesota (for appellant-father A.L.P.)

Philip Miller, Benton County Attorney, William V. Faerber, Assistant County Attorney, Foley, Minnesota (for respondent)

Enoch Dix, Waite Park, Minnesota (guardian ad litem)

Considered and decided by Larkin, Presiding Judge; Connolly, Judge; and Kirk, Judge.

**U N P U B L I S H E D   O P I N I O N**

**LARKIN**, Judge

Respondent-county petitioned to terminate, involuntarily, the parental rights of mother and father. Mother admitted the portion of the petition addressing her

circumstances, and the district court terminated mother's parental rights. After a trial, the district court terminated father's parental rights. Both parents appealed. In appeal A16-0309, mother argues that she should be allowed to withdraw her admission because she received ineffective assistance of counsel and because she was coerced into making her admission. In appeal A16-0310, father argues that the evidence is insufficient to support the termination of his parental rights. This court consolidated the appeals. Because the district court failed to make findings sufficient to support its termination of father's parental rights and our review of the record shows the existence of questions that an appellate court cannot resolve, we reverse the termination of father's parental rights and remand for further proceedings. But because the record is inadequate to support mother's arguments for reversal, we affirm the termination of her parental rights.

## FACTS

The children of appellant-mother M.A.K. and appellant-father A.L.P. were born in 2005 and 2008.[1] In 2015, respondent Benton County Human Services (the county) filed a petition alleging the children were in need of protection or services (CHIPS). The petition detailed social-service interventions on behalf of the children over a roughly ten-year period and alleged that in April 2015, the children found mother unconscious at their residence.[2] During her resulting hospitalization, mother tested positive for opiates and

---

[1] The district court did not specifically address either A.L.P.'s paternity or the parents' custodial rights. The record suggests that the parents are divorced and had joint legal and joint physical custody; that the children resided primarily with father, who later obtained sole custody; and that mother subsequently obtained custody.

[2] Although the district court did not specifically address the issue, the record suggests that father did not reside with mother and the children at this time.

2

tricyclic antidepressants. After her release from the hospital, mother was put on a 72-hour psychiatric hold, and the district court held an emergency protective-care hearing. In the resulting order, the district court placed the children in out-of-home placement, finding that "the children's health, safety and welfare would be immediately endangered if the children were returned to the care of their parents" and noting its "grave concern for the safety of the children if they were returned to their parents." The district court also found that the county had made reasonable efforts to avoid the out-of-home placement and that it was in the best interests of the children to be put in the custody of the county for placement in foster care.

At a hearing on the CHIPS petition, mother admitted that, when the CHIPS petition was filed, the children were without proper parental care due to her drug use, her mental-health issues, and her hospitalization. *See* Minn. Stat. § 260C.007, subd. 6(8) (2014) (listing lack of proper parental care as a basis for a CHIPS adjudication). Father also admitted that the children lacked proper parental care due to mother's problems.

The district court ordered each parent to complete a case plan. Except for the requirement in mother's plan that she complete a neuropsychological evaluation and follow its recommendations, the plans were similar.[3]

---

[3] The similar elements of the case plans required the parents to (1) cooperate with child-protective services; (2) abstain from use, possession, and sale of non-prescribed mood-altering chemicals; (3) submit to drug testing, with missed tests or diluted test results deemed positive for chemical use; (4) complete a new chemical-use assessment in the event of a positive drug test or an admission to chemical use; (5) complete an updated parental-capacity assessment; (6) participate in family-based counseling if deemed appropriate by the county; (7) remain law abiding; (8) attend supervised visits as scheduled and provide 24-hour notice if a visit needed to be canceled; and (9) maintain safe and stable housing.

Later, the county petitioned to terminate both parents' parental rights, asserting that mother's compliance with her case plan had been "moderately successful" and that father's compliance with his case plan had been "minimal and sporadic." The county recommended that parental rights be terminated because each parent "has substantially, continuously, or repeatedly refused or neglected to comply with the duties imposed upon that parent by the parent and child relationship" and that "reasonable efforts, under the direction of the court, have failed to correct the conditions leading to the child's placement." Minn. Stat. § 260C.301, subd. 1(b)(2), (b)(5) (2014).

At the pretrial hearing on the termination of parent rights (TPR) petition, mother admitted that reasonable efforts had failed to correct the conditions that led to the children's out-of-home placement. *See* Minn. Stat. § 260C.301, subd. 1(b)(5) (listing a failure of reasonable efforts to correct conditions leading to an out-of-home placement as a basis to terminate parental rights). After mother's admission, the children's guardian ad litem (GAL) opined that termination of mother's parental rights was in the children's best interests. The district court accepted mother's admission, but withheld termination of her parental rights pending father's trial on the county's petition to terminate his parental rights.

At trial, the assigned child-protection worker (CPW) testified that father did not complete his case plan, stating that he tested positive for cocaine twice and missed eight tests, including one scheduled to occur just before trial; although father completed a chemical-use assessment, the county did not consider the assessment valid because the assessor thought father's responses were dishonest; although another assessment was

4

scheduled to occur just before trial, it was not completed because the assessor was ill; and father's use of cocaine and his commission of certain traffic offenses showed that father failed to remain law abiding. The CPW also testified that father failed to cooperate with a home study and that father's supervised visits were suspended because he missed one visit and left another visit early. In addition, one child's therapist was required to be present at father's visits with the child because that child alleged that father abused her while she was in his care. One phone visit between father and the other child was cut short because supervisors at the facility where the child was placed thought father was belligerent and intoxicated. The CPW testified that termination of father's parental rights would be in the children's best interests.

The psychologist who performed father's parental-capacity assessment stated that the appointment for the assessment had to be rescheduled twice, each time because father failed to make himself available. The psychologist testified that based on her examination, her observations, and tests she administered, she suspected father had abused the children. The psychologist further testified that father presented a "poor prognosis for change" because of his untreated chronic and pervasive mental-health problems, apparent continued difficulty with substance abuse, and domestic-relationship problems to which his children have been exposed. The psychologist testified that father "seems to be in denial regarding the needs of his children as they pertain to him" and that "he criticizes and blames others." The psychologist concluded that father did not have the capacity to parent the children now and that she did not foresee a possibility that he could do so in the foreseeable future.

The GAL recommended termination of father's parental rights based on the parental-capacity assessment and father's failure to satisfy his case plan. The GAL noted that when the children lived with father, father allegedly continued to use chemicals and failed to provide current addresses for the children, and the children were once locked in a garage.

Father testified that he had been involved in three other child-protection cases in Minnesota, he had worked each case plan successfully, he did not want to use cocaine, and he wanted "to continue [the] personal recovery that [he had] been doing for years." Father also testified that he "really didn't want to" work on another case plan when the CHIPS petition was filed in this case and that he was "sick of court" because he had "been in court the last six years for [his] kids." Father explained that he left one visit with the children early because of obligations to his two other children, he missed drug tests because he was working, and he did not want to complete the home study because he "was staying with somebody that [he] was involved with, and [he] just didn't want to finish completing it there." Father testified that he was ready then, and in the near future, to be a father to the children given that mother would no longer have parental rights.

After trial, the district court ruled that "[t]here is clear and convincing evidence that [father] has failed to comply with his parental duties pursuant to Minn. Stat. § 260C.301, subd. 1(b)(2)." The district court reasoned that father had "failed to keep the children safe" and had "failed to cooperate in any significant way with the Court ordered case plan." The district court also ruled that "[t]here is clear and convincing evidence that the reasonable efforts of Benton County Human Services failed to correct the conditions that led to the

6

children's placement out of the home pursuant to Minn. Stat. § 260C.301, subd. 1(b)(5)." The district court stated that father failed to substantially complete the court-ordered case plan by "failing to abstain and submit to drug testing as requested, failing to complete a Rule 25 assessment, . . . failing to attend visitations as scheduled, and failing to complete a Court ordered home study[.]" The district court terminated both parents' parental rights to the children, and each parent filed an appeal. This court consolidated the appeals.

## D E C I S I O N

### I.

There is a "presumption that a natural parent is a fit and suitable person to be entrusted with the care of his or her child." *In re Welfare of A.D.*, 535 N.W.2d 643, 647 (Minn. 1995). Thus, "[o]rdinarily, it is in the best interest of a child to be in the custody of his or her natural parents." *Id.* As a result, "[p]arental rights are terminated only for grave and weighty reasons." *In re Welfare of M.D.O.*, 462 N.W.2d 370, 375 (Minn. 1990).

In a proceeding to terminate parental rights, "[t]he petitioner . . . bears the burden of producing clear and convincing evidence that one or more of the statutory termination grounds exists." *In re Matter of Welfare of C.K.*, 426 N.W.2d 842, 847 (Minn. 1988); *see* Minn. Stat. § 260C.317, subd. 1 (2014) (requiring "clear and convincing evidence" of a statutory basis to terminate parental rights); *see also* Minn. Stat. § 260C.301, subd. 1(b) (2014) (listing the statutory grounds for involuntarily terminating parental rights). "Language throughout the juvenile protection laws emphasizes that the court 'may,' but is not required to, terminate a parent's rights when one of the nine statutory criteria is met." *In re Welfare of Child of R.D.L.*, 853 N.W.2d 127, 136-37 (Minn. 2014) (citing various

7

statutes). Thus, "termination of parental rights is always discretionary with the juvenile court." *Id.* at 136; *compare* Minn. Stat. § 645.44, subd. 15 (2014) (stating that "'[m]ay' is permissive"), *with* Minn. Stat. § 645.44, subd. 16 (2014) (stating that "'[s]hall' is mandatory"). Moreover, the mere existence of a statutory ground for terminating parental rights is, by itself, insufficient to allow a district court to involuntarily terminate parental rights; "an involuntary termination of parental rights is proper only when at least one statutory ground for termination is supported by clear and convincing evidence *and* the termination is in the child's best interest." *R.D.L.*, 853 N.W.2d at 137.

There are nine statutory bases for involuntarily terminating parental rights. *See* Minn. Stat. § 260C.301, subd. 1(b) (listing statutory bases for terminating parental rights). The existence of any single statutory basis for involuntarily terminating parental rights requires the existence of multiple "underlying" or "basic" facts. *In re Welfare of Children of J.R.B.*, 805 N.W.2d 895, 899-900, 899 n.2 (Minn. App. 2011), *review denied* (Minn. Jan. 6, 2012). The different statutory bases for involuntarily terminating parental rights require the existence of different "underlying" or "basic" facts. *See* Minn. Stat. § 260C.301, subd. 1(b) (listing requirements for various statutory bases for involuntarily terminating parental rights). Thus, when a district court addresses "whether any particular statutory basis for involuntarily terminating parental rights is present," the district court must consider and make findings addressing the "underlying" or "basic" facts relevant to the statutory basis for termination being considered by the court. *J.R.B.*, 805 N.W.2d at 899-900.

After making findings of fact addressing those "underlying" or "basic" facts, the district court must "decide whether its findings on those factors show the statutory basis for termination to be present." *Id.* And although we "review the district court's findings of the underlying or basic facts for clear error, . . . we review its determination of whether a particular statutory basis for involuntarily terminating parental rights is present for an abuse of discretion." *Id.* at 901.

Regarding a district court's assessment of a child's best interests:

> If the district court finds the presence of at least one statutory basis to terminate parental rights, the best interests of the child must be the paramount consideration in deciding whether to actually terminate parental rights, and, if there is a conflict between the interests of a parent and a child, the interests of the child are paramount. In analyzing a child's best interests, the court must balance three factors: (1) the child's interest in preserving the parent-child relationship; (2) the parent's interest in preserving the parent-child relationship; and (3) any competing interest of the child. Competing interests include such things as a stable environment, health considerations and the child's preferences.

*Id.* at 905 (quotations and citations omitted). "We review a district court's ultimate determination that termination is in a child's best interest for an abuse of discretion." *Id.*

In sum, in a proceeding to involuntarily terminate parental rights, a district court must (a) use the clear-and-convincing-evidence standard when making findings of fact regarding the presence of the "underlying" or "basic" facts which are used to determine the existence of a statutory basis for involuntarily terminating parental rights; (b) decide whether the "basic" or "underlying" facts found establish a statutory basis to involuntarily terminate parental rights; (c) exercise its discretion to determine whether terminating

9

parental rights is in the child's best interests; and (d) exercise its discretion to decide whether to actually terminate parental rights.

On appeal, an appellate court will (a) review the district court's findings of the "underlying" or "basic" facts for clear error and do so in light of the fact that the district court needed clear-and-convincing evidence to make those findings in the first instance and (b) review the district court's other three decisions (whether a statutory basis for terminating parental rights is present, whether termination is in the best interests of the child, and whether to actually terminate parental rights) for an abuse of discretion. "A finding is clearly erroneous if it is either manifestly contrary to the weight of the evidence or not reasonably supported by the evidence as a whole." *In re Welfare of Children of T.R.*, 750 N.W.2d 656, 660-61 (Minn. 2008) (quotation omitted). A district court abuses its discretion if its underlying findings of fact are clearly erroneous, if it misapplies the law, or if it resolves the matter in a manner that is against logic and the facts on record. *Dobrin v. Dobrin*, 569 N.W.2d 199, 202 (Minn. 1997) (noting that clearly erroneous findings and a misapplication of law constitute an abuse of discretion); *Rutten v. Rutten*, 347 N.W.2d 47, 50 (Minn. 1984) (stating that resolving matter in manner contrary to logic and facts on record constitutes abuse of discretion).

## II.

Father challenges the termination of his parental rights, arguing that the record does not support the statutory grounds on which the termination is based, that the district court did not fully address or consider whether the county made reasonable efforts to correct the

conditions leading to the out-of-home placement, and that the district court failed to examine the children's best interests.

## A.     Best interests

A child's best interests can preclude termination of a parent's parental rights, even if the district court rules that one or more of the statutory bases for terminating that parent's parental rights is present. *In re Welfare of Child of D.L.D.*, 771 N.W.2d 538, 545 (Minn. App. 2009). Thus, before terminating a parent's parental rights, the district court "shall make a specific finding that termination is in the best interests of the child and shall analyze [the factors listed in the rule]." Minn. R. Juv. Prot. P. 39.05, subd. 3(b)(3); *see* Minn. R. Juv. Prot. P. 42.08, subd. 1 (stating that an order involuntarily terminating parental rights "shall include" "findings regarding how the order is in the best interests of the child"). When addressing a child's best interests, "the district court must . . . explain why termination is in the best interests of the child[,]" and "the absence of findings on the child's best interests in a TPR proceeding constitutes error that requires remand." *D.L.D.*, 771 N.W.2d at 545-46.

Here, because the district court made no findings addressing why termination of father's parental rights is in the children's best interests, the district court failed to make findings sufficient to support its decision to terminate father's parental rights. And this court cannot cure that defect in the district court's order. *See In re Welfare of Child of J.L.L.*, 801 N.W.2d 405, 414 (Minn. App. 2011) (stating that "determination of a child's best interests is generally not susceptible to an appellate court's global review of a record," and "an appellate court's combing through the record to determine best interests is

11

inappropriate because it involves credibility determinations" (quotations omitted)), *review denied* (Minn. July 28, 2011). Therefore, we cannot affirm the termination of father's parental rights.

**B.     Failure to correct conditions**

A statutory basis for termination of parental rights exists if, "following the child's placement out of the home, reasonable efforts, under the direction of the court, have failed to correct the conditions leading to the child's placement." Minn. Stat. § 260C.301, subd. 1(b)(5). Reasonable efforts are presumed to have failed upon a showing of the existence of certain conditions listed in the statute. *See id.* Here, the district court found that father "failed to substantially complete the Court ordered case plan . . . by failing to abstain and submit to drug testing as requested, failing to complete a Rule 25 assessment, . . . failing to attend visitations as scheduled, and failing to complete a Court ordered home study in Clay County." This record clearly and convincingly supports these findings of "underlying" or "basic" facts. Grounded thereon, the district court found the existence of the statutory basis for terminating parental rights recited in section 260C.301, subdivision 1(b)(5). Father challenges this determination, arguing that the district court did not fully address or consider whether the county made reasonable efforts to correct the conditions leading to the out-of-home placement. This argument has merit.

Section 260C.301, subdivision 1(b)(5) requires a finding that "reasonable efforts, under the direction of the court, have failed to correct the conditions leading to the child's placement." *Id.* "Reasonable efforts encompass more than just a case plan." *In re Welfare of Child of J.K.T.*, 814 N.W.2d 76, 88 (Minn. App. 2012). Because "reasonable efforts"

12

include more than just a case plan, a mere failure to satisfy a case plan is not independently sufficient to show that reasonable efforts have, in fact, failed. *See, e.g.*, *In re Child of E.V.*, 634 N.W.2d 443, 447, 450 (Minn. App. 2001) (noting that a district court's findings that a parent "fail[ed] to comply with the case plan . . . singularly support[ed] the court's conclusions that reasonable efforts ha[d] failed and [that] termination [was] appropriate[,]" and reversing the termination because the findings of failure to comply with the case plan were "conclusory" and the district court did not address whether full compliance with the case plan "was necessary to correct the conditions that led to the out-of-home placement").

In determining whether the county made reasonable efforts, the district court must consider whether the county offered services that were "(1) relevant to the safety and protection of the child; (2) adequate to meet the needs of the child and family; (3) culturally appropriate; (4) available and accessible; (5) consistent and timely; and (6) realistic under the circumstances." Minn. Stat. § 260.012(h) (2014). Alternatively, the district court may rule, after making the relevant factual findings, that "provision of services or further services for the purpose of rehabilitation is futile and therefore unreasonable under the circumstances." *Id.* In addition to these reasonable-efforts findings necessary for a district court to invoke section 260C.301, subdivision 1(b)(5), the termination statute also requires "specific findings" in every TPR proceeding "that reasonable efforts to finalize the permanency plan to reunify the child and the parent were made" or "that reasonable efforts [were] not required" as set out in Minn. Stat. § 260.012. Minn. Stat. § 260C.301, subd. 8 (2014); *see In re Welfare of S.Z.*, 547 N.W.2d 886, 892 (Minn. 1996) (making a similar observation). When addressing whether a county made reasonable efforts to reunite a

13

family, the district court must make "individualized and explicit findings regarding the nature and extent of efforts made by the social services agency to rehabilitate the parent and reunite the family." Minn. Stat. § 260C.301, subd. 8(1).

Here, the district court's conclusory statement that "reasonable efforts of [the county] failed to correct the conditions that led to the children's placement" does not satisfy the statutory and caselaw requirements recited above. And this court cannot supplement the district court's order with its own findings. *See In re Welfare of Child of S.S.W.*, 767 N.W.2d 723, 733 (Minn. App. 2009) (stating that "[a]n appellate court exceeds its proper scope of review when it bases its conclusions on its own interpretation of the evidence and, in effect tries the issues anew and substitutes its own findings for those of the trial judge" (quotation omitted)); *see also R.D.L.*, 853 N.W.2d at 131 n.5 (making a similar statement). The county's efforts may, in fact, have been reasonable, but without explicit findings describing those efforts and addressing the reasonable-efforts factors, we cannot evaluate the district court's ruling on the subject. Therefore, even apart from the district court's failure to adequately address the best-interests considerations discussed above, we could not affirm the termination of father's parental rights for a failure to correct the conditions leading to the out-of-home placement.

## C.    Duties of the parent-child relationship

A district court may terminate parental rights if a parent "substantially, continuously, or repeatedly refused or neglected to comply with the duties imposed upon that parent by the parent and child relationship," and "either reasonable efforts by the [county] have failed to correct the conditions that formed the basis of the petition or

14

reasonable efforts would be futile . . . ."[4]  Minn. Stat. § 260C.301, subd. 1(b)(2).  The district court found that there was clear-and-convincing evidence that father failed to comply with his parental duties because he "failed to keep the children safe" and "failed to cooperate in any significant way with the Court ordered case plan."

Although a "[f]ailure to satisfy requirements of a court-ordered case plan provides evidence of a parent's noncompliance with [parental] duties and responsibilities under section 260C.301, subdivision 1(b)(2)," *In re Welfare of Children of K.S.F.*, 823 N.W.2d 656, 666 (Minn. App. 2012), this court generally requires more than a mere failure to complete a case plan to affirm a termination of parental rights based on failure to comply with parental duties.  *See, e.g.*, *K.S.F.*, 823 N.W.2d at 666-67 (affirming a termination of parental rights based on failure to comply with parental duties, noting both that the parent failed to comply with the case plan and that the record otherwise showed that the parent did not adequately care for the children); *In re Child of Simon*, 662 N.W.2d 155, 163 (Minn. App. 2003) (describing a parent's failure to comply with key case-plan components, the parent's failure to provide meaningful parenting to the child, and the lack of evidence that the parent possessed the skills and knowledge to parent the child effectively).

Even though the district court made findings regarding father's failure to comply with his case plan, it did not make findings explaining how father failed to comply with his

---

[4] We note that our analysis of the district court's reasonable-efforts determination, noted above, applies here.  *See* Minn. Stat. § 260C.301, subd. 8 (requiring "specific findings" in every TPR proceeding "that reasonable efforts to finalize the permanency plan to reunify the child and the parent were made" or "that reasonable efforts [were] not required").

15

parental duties.[5]  For example, the district court generally found that father "failed to keep the children safe," but did not make additional findings to explain what father did, or failed to do, in that regard.  The GAL testified that when the children lived with father, father allegedly continued to use chemicals and failed to provide current addresses for the children, and the children were once locked in a garage.  But the district court did not make findings addressing whether any of the events mentioned by the GAL actually occurred.  Similarly, although there was evidence that one child alleged that father had abused her and that the psychologist suspected that father had abused the children, the district court did not make findings addressing these matters.

We recognize that the district court gave "great weight" to the psychologist's parental-capacity assessment of father.  The district court found that the psychologist determined that father should not be reunified with the children "now or in the foreseeable future," noting father's long-standing problems with chemicals, untreated mental-health problems, and inability to take responsibility for his children's situation.  But the district court did not make findings specifically addressing father's mental-health diagnosis, and its generic findings regarding the psychologist's assessment do not connect the assessment

---

[5] Father's admission to the allegations in the CHIPS petition does not establish his failure, for TPR purposes, to satisfy his parental duties.  First, father admitted that the children were in need of protection or services due to *mother's* parenting deficiencies, not his own.  Second, if a parent's admission to the allegations of a CHIPS petition allowed a TPR, that admission would (if the parent admitted to inadequacies on his or her own behalf) functionally absolve the county of its statutory obligation to show parental inadequacy, and impose on that parent a burden of showing parental adequacy.

16

with its decision to terminate father's parental rights based on his failure to comply with parental duties.

We can imagine the ways in which chemical-pendency and mental-health issues may have caused father to neglect his parental duties, but the county had the burden to present clear-and-convincing evidence establishing father's failures as a parent. Minn. Stat. § 260C.317, subd. 1. And the district court was obligated to make specific findings that address the statutory ground for termination. *J.R.B.*, 805 N.W.2d at 899-900. A decision to terminate parental rights must be supported by detailed findings showing that the district court fully considered all aspects of the relevant statutory ground for termination and that termination is appropriate. *See id.* (noting that a district court must make findings of the underlying facts regarding the statutory criteria for a particular basis for terminating parental rights before exercising its discretion to address whether that basis is present). The Minnesota Supreme Court has said, in the context of an appeal of a child-custody determination, that findings of fact explaining a district court's exercise of its discretion are necessary to "(1) assure consideration of the statutory factors by the [district] court; (2) facilitate appellate review of the [district] court's custody decision; and (3) satisfy the parties that this important decision was carefully and fairly considered by the [district] court." *Rosenfeld v. Rosenfeld*, 311 Minn. 76, 82, 249 N.W.2d 168, 171 (1976). Findings explaining a district court's discretionary decision in a TPR case seem even more necessary given the importance of the rights at stake. *See* Minn. Stat. § 260C.317, subd. 1 (noting the severance of "all rights, powers, privileges, immunities, duties, and obligations" upon termination).

17

It may be that a clear-and-convincing case could be made for termination of father's parental rights for failure to comply with parental duties, but the district court's generalized trial findings are insufficient to support termination under section 260C.301, subd. 1(b)(2).

## D.    Summary

In sum, the district court failed to make findings adequately addressing the children's best interests, whether the county made reasonable efforts, and the statutory grounds on which termination was based. We recognize that a district court has significant discretion when deciding whether to terminate parental rights. *R.D.L.*, 853 N.W.2d at 136. However, we cannot defer to a district court's exercise of its discretion when the district court did not make findings adequate to support its decision and the record does not enable us to address the relevant questions as matters of law. We therefore reverse the termination of father's parental rights and remand for further proceedings pursuant to the district court's continuing CHIPS jurisdiction. *See* Minn. Stat. § 260C.312 (2014) (stating that if TPR proceedings do not result in termination, the district court retains jurisdiction if a child is determined to be in need of protection or services). This opinion does not preclude new permanency proceedings if reunification is not possible.

## III.

## A.    Ineffective assistance of counsel

Mother argues that she was "denied effective assistance of counsel" when she entered her admission to the TPR petition. She argues that, when she entered her admission, she incorrectly "believed that in exchange for her admission and agreement to terminate her parental rights, she would be in a position to have continuing contact with

18

her children." Mother asserts that the transcript of her admission shows that she was "clearly confused" on this point and that her "many mental health diagnoses" in her parental-capacity evaluation show that she was "not capable of making a knowing and voluntary admission to terminate her own parental rights." Mother concludes that, because her trial counsel knew of her mental-health problems, allowing her to admit the TPR petition was, "at least arguably," ineffective representation.

A parent has "the right to effective assistance of counsel in connection with a proceeding in juvenile court." Minn. Stat. § 260C.163, subd. 3(a) (2014). In analyzing ineffective-assistance-of-counsel claims in other noncriminal contexts, Minnesota courts have applied the test set out in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984). *See, e.g.*, *In re Welfare of L.B.*, 404 N.W.2d 341, 345 (Minn. App. 1987) (applying *Strickland* in juvenile-delinquency context); *see also Beaulieu v. Minn. Dep't of Human Servs.*, 798 N.W.2d 542, 550 (Minn. App. 2011) (applying *Strickland* in civil-commitment context), *aff'd*, 825 N.W.2d 716 (Minn. 2013). Under *Strickland*, a party asserting ineffective assistance of counsel must show that counsel's representation fell below an objective standard of reasonableness and that there was a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 688, 694, 104 S. Ct. at 2064, 2068. Counsel provides objectively reasonable representation by "exercising the customary skills and diligence that a reasonably competent attorney would perform under similar circumstances." *State v. Hokanson*, 821 N.W.2d 340, 358 (Minn. 2012) (quotation omitted). "In evaluating claims of ineffective

19

assistance of counsel, there is a strong presumption that counsel's performance was reasonable." *Andersen v. State*, 830 N.W.2d 1, 10 (Minn. 2013).

Here, mother did not raise her ineffective-assistance-of-counsel claim in district court and did not otherwise submit direct evidence supporting the claim. For example, mother did not submit an affidavit stating that she did not understand her admission, that her attorney did not adequately explain her rights or the consequences of her admission, or that her decision to enter an admission was the result of her attorney's inadequate representation. On appeal, mother relies on the transcript of her admission, arguing that it indicates that she was "clearly confused when the admission was entered." Mother also relies on her "many mental health diagnoses which are included in [her] parental-capacity evaluation" and asserts that based on these untreated mental-health issues, she was "not capable of making a knowing and voluntary admission to terminate her own parental rights."

The portion of the transcript addressing mother's admission to the TPR petition shows that the admission was based on an agreement between mother and the county under which mother would be allowed to visit the children "as scheduled through January 29th," the date of father's scheduled TPR trial, and that thereafter, she would be allowed to visit "both children as long as a therapist deems that it's therapeutically appropriate." The county's attorney confirmed that this was the county's understanding of the agreement. The following exchange occurred between mother and her attorney:

> Q:   And you would agree that . . . you failed to correct the conditions that led to the out-of-home placement?

A: Really—you say that, but I really done what everybody has asked me to do so I don't know how that's correct.

Q: You understand that you've been able to check some things off as far as being able to have completed them, but because of your cognitive disability you are never going to be able to move forward beyond where you are at today, that's the recommendation from [a psychologist who assessed mother], do you understand that?

A: Yeah.

Q: And you understand that based on that, that it's highly likely that the Court would terminate your parental rights?

A: Yeah.

Q: And you understand that if the Court did terminate your parental rights you understand that there would be no agreement as far as any continued contact with the children, do you understand that?

A: Yes.

Q: So that's also one of the reasons why you're trying to take advantage of this admission and agreement here today, is that correct?

A: Yes.

Q: And so based on all of that you would agree that you haven't been able to demonstrate that the conditions that led to the out-of-home placement have been completed, correct?

A: Yes.

Mother further stated that she wanted to give up her trial rights, "As long as I can still see my kids." When asked whether she understood that her decision to admit to the TPR petition would be permanent, mother stated, "you said that I would be able to still see my kids. If that's the case then, yes."

"Upon the termination of parental rights all rights, powers, privileges, immunities, duties, and obligations, including any rights to . . . visitation . . . existing between the child and parent shall be severed and terminated[.]" Minn. Stat. § 260C.317, subd. 1. Thus, this record could suggest that, to the extent mother believed she could visit her children as a matter of *right* after termination (as opposed to being able to visit the children if the court

21

granted her permission to do so), mother was misinformed regarding her post-termination ability to visit the children. However, without information regarding what mother's attorney told her about the effect of a termination order on the agreement, we will not infer that her attorney's representation was objectively unreasonable. *See Andersen*, 830 N.W.2d at 10 (addressing the "strong presumption" of reasonable representation). Given the presumption that counsel's performance was reasonable and the lack of direct evidence from mother regarding her attorney's advice, the record is insufficient to support mother's ineffective-assistance-of-counsel claim. *See Robinson v. State*, 567 N.W.2d 491, 495 (Minn. 1997) (stating that "a court needs to hear testimony from the defendant, his or her trial attorney, and any other witnesses who have knowledge of conversations between the client and the attorney" to evaluate an ineffective-assistance-of-counsel claim involving the communication of information about plea agreements). We therefore decline to grant relief.

**B.    Coercion**

For the first time on appeal, mother argues that she was coerced to enter her admission and that, therefore, she should be allowed to withdraw her admission or be granted an evidentiary hearing to address whether her admission was in fact coerced. This court has allowed parents to withdraw admissions to a CHIPS petition after concluding that the admissions were coerced and that the parents were misled about the nature of their admissions. *In re Welfare of Child of M.K.*, 805 N.W.2d 856, 861-64 (Minn. App. 2011). This court has also reversed and remanded for a hearing to determine whether a parent's admission to a TPR petition was coerced. *In re Welfare of Children of M.L.A.*, 730 N.W.2d

54, 61, 62 (Minn. App. 2007). In those cases, however, the parents raised the coercion issue in district court. *M.K.*, 805 N.W.2d at 860-61; *M.L.A.*, 730 N.W.2d at 57-58. Moreover, in *M.L.A.*, the parent who requested withdrawal of her admission submitted an affidavit describing the alleged coercion. 730 N.W.2d at 57. And in *M.K.*, the coercion was obvious from the record. *See M.K.*, 805 N.W.2d at 862 (noting that the county "conditioned provision of services to [the child] on [the] parents' admissions to a statutory basis for a finding that [the child] is a CHIPS").

Here, mother's failure to raise her coercion claim in district court presents two problems. First, a failure to raise the question in district court suggests that the question is not properly before this court. *See In re Welfare of D.D.G.*, 558 N.W.2d 481, 485 (Minn. 1997) (noting that, when an argument that a parent's voluntary termination of parental rights was improper had not been raised in district court, the question was not properly before the supreme court and that "[t]he gravity of termination proceedings" was "not a sufficient reason to abandon our established rules of appellate argument" and consider the question). Second, because mother did not submit an affidavit in district court alleging coercion, and because the alleged coercion is not apparent, the record is inadequate to determine whether mother's admission was, in fact, coerced. Similarly, the record is inadequate to justify a remand to the district court to investigate the question. Thus, even

23

if the question of coercion were properly before this court, we could not grant relief on this issue.[6]

**Affirmed in part, reversed in part, and remanded.**

---

[6] We note that the rules of juvenile protection procedure state that "an admission may be withdrawn at any time upon a showing that withdrawal is necessary to correct a manifest injustice." Minn. R. Juv. Prot. P. 35.03, subd. 5(a). We also note that a motion for relief from an order terminating parental rights must "be made within a reasonable time, but in no event shall it be more than ninety (90) days following the service of notice by the court administrator of the filing of the court's order." Minn. R. Juv. Prot. P. 46.02. Because the issue is not currently before us, we do not address what, if any, interaction there may be between these rules.