In the Matter of the WELFARE OF D.D.G.

No. C8–96–455.

Supreme Court of Minnesota.

Feb. 6, 1997.

Mark A. Paige, Inver Grove Heights, for appellant.

Kathryn P. Scott, Assistant County Attorney, Hastings, for respondent.

Susan Bates Gegen, St. Paul, guardian ad litem.

## OPINION

KEITH, Chief Justice.

Dakota County petitioned for involuntary termination of the parental rights of respondent Avery Hobbs, D.D.G.'s biological father, and Tamara Growette, D.D.G.'s biological mother. The mother's rights were terminated by default, and Hobbs voluntarily consent-

ed to termination. After Hobbs' first appeal to the court of appeals was dismissed, he filed a motion to vacate in the trial court. The trial court denied Hobbs' motion, but the court of appeals reversed and vacated the termination order. *In re D.D.G.*, 553 N.W.2d 86, 90 (Minn.App.1996). The county, the attorney for the child, and the guardian ad litem filed a joint petition for further review. We reverse the court of appeals and uphold the termination order.

### I.

D.D.G. was born on January 20, 1993. At that time, both Hobbs and Growette were on probation for felony drug possession. Hobbs lived with D.D.G. and Growette until September or October 1993.

On August 23, 1993, Dakota County filed a child in need of protection or services (CHIPS) petition under Minn.Stat. § 260.015, subd. 2a(8)–(9) (1996), based on allegations of substance abuse by Growette and domestic abuse by Hobbs, including his conviction for fifth-degree assault against Growette. On September 27, the trial court allowed D.D.G. to remain at home with Growette, conditioned on her abstinence from drug use and the separation of Growette and Hobbs during the completion of domestic abuse counseling. The court also permitted visitation of D.D.G. by Hobbs, conditioned on no further instances of drug use, alcohol use, and domestic violence by Hobbs.

But after Hobbs broke Growette's jaw in October 1993 while D.D.G. was in the house, and after Growette failed to pursue cocaine relapse treatment or complete a psychological evaluation, the court ordered D.D.G. to be placed in the home of his maternal grandparents on December 16. The grandparents were already caring for D.D.G.'s half-brother. The CHIPS petition for D.D.G. was then granted on February 8, 1994.

Hobbs was convicted of third-degree assault against Growette for the October 1993 incident. He had previously pleaded guilty to terroristic threats against a social worker assigned to work with him on the CHIPS file for his daughter, J.I.H. These incidents resulted in the revocation of Hobbs' probation and he was sentenced to prison in April 1994.

Hobbs had three court-authorized visits with D.D.G. prior to the termination hearing in May 1995.

The county petitioned for involuntary termination of the parental rights of both Hobbs and Growette with respect to D.D.G. on August 3, 1994. On the first day of the termination hearing, Growette did not appear and her parental rights were terminated by default. Hobbs then took the stand and admitted that he needed continued chemical dependency treatment for his cocaine addiction, anger management treatment, and parenting classes, and that he had to "get [his] life together" before he could "even consider trying to raise" D.D.G.

On the second day of the termination hearing, Hobbs agreed to voluntarily terminate his parental rights for good cause. Hobbs testified that he was satisfied with his legal representation; that he wanted to settle the case; that he had sufficient time to decide whether to consent to termination; that termination was in D.D.G.'s best interests; and that he understood that termination meant that he could no longer make decisions that affect D.D.G. nor would he retain any rights regarding D.D.G. He also said that he understood that his decision was final and that, in the words of his counsel, he could not change his mind "six months from now, six years from now, ten years from now, and say, gee, I'm [D.D.G.]'s dad and I want to step in and be his dad." Hobbs was also asked whether he was forced or coerced to consent to termination, if anyone made "any promises that made you make this decision," or whether Hobbs made the decision on his own. Hobbs did not acknowledge any such influences and stated that it was a decision for which he asked help from God, and that God had him make the decision. Upon reflection, Hobbs testified, he decided that his initial opposition to termination was based on his own interests, but that termination was in D.D.G.'s best interests. The county agreed to cease its involuntarily termination efforts based on Hobbs' consent.

After Hobbs articulated his reasons for consenting to termination, Hobbs' counsel questioned him regarding certain adoption

conditions that the county had indicated it intended to impose on whomever adopted D.D.G.—presumably, D.D.G.'s grandparents: (1) that Hobbs would inform the adoptive parents of his address so that they could send him pictures and videotapes of D.D.G. on a yearly basis near D.D.G.'s birthday; (2) that Hobbs would be allowed to send cards and letters to the termination of parental rights file, which would be available to D.D.G. upon request on his eighteenth birthday, or earlier if D.D.G.'s therapist determined that it would be in D.D.G.'s best interests; and (3) that Hobbs would be allowed direct contact with D.D.G. by phone or in person "within a therapeutic context," if D.D.G's therapist determined that such contact was in D.D.G.'s best interests, but Hobbs understood that unsupervised visitation would not be anticipated. These "open adoption" conditions were recited in the trial court's findings of fact, but not incorporated into its order. Attorneys for the petitioners told the court that D.D.G.'s grandparents thought the open adoption conditions were acceptable, and the guardian ad litem testified that the matter had been resolved in accord with D.D.G.'s best interests.

The trial court concluded that clear and convincing evidence and the child's best interests supported voluntary termination of Hobbs' parental rights under Minn.Stat. § 260.221, subd. 1(a). The court found good cause for Hobbs' consent based on the length of time D.D.G. had already spent in out-of-home placement; Hobbs' unavailability to parent D.D.G. due to Hobbs' incarceration and treatment needs; Hobbs' recognition that "the domestic violence, drug use, and police raids in the home he had with Tamara Growette has been harmful to his son"; and Hobbs' testimony that D.D.G.'s interests would be best served by permanent placement with his half-brother, and that it would be unfair for D.D.G. to wait for Hobbs' release from prison and completion of chemical dependency treatment, anger management, and parenting programs before Hobbs could begin parenting. According to D.D.G.'s grandmother, D.D.G. is very close to his half-brother and the grandparents are willing to adopt both children.

Almost two months after the hearing, Hobbs filed a notice of appeal. On November 2, 1995 the court of appeals dismissed this direct appeal because the proposed issues appeared to have been waived, but stated that Hobbs was not precluded from bringing a motion to vacate the termination order in the trial court.

The trial court denied Hobbs' motion on January 31, 1996. First, the court found that Hobbs' consent was knowing and voluntary, based on his testimony at the termination hearing. Second, the court apparently held that the county's "open adoption" promises created enforceable contract rights. The court of appeals reversed, concluding that Hobbs' consent was unwritten and based on "illusory" open adoption conditions under *In re Adoption of C.H.*, 548 N.W.2d 292, 297 (Minn.App.), *aff'd*, 554 N.W.2d 737, 741 (Minn.1996). *See D.D.G.*, 553 N.W.2d at 89–90.

The county, counsel for D.D.G., and the guardian ad litem filed a joint petition for further review. We granted the petition and expedited the matter on November 20, 1996.

## II.

In general, a voluntary termination order may be rescinded only upon a showing of fraud, duress, or undue influence. *In re K.T.*, 327 N.W.2d 13, 17–18 (Minn.1982) (explaining that a change of mind or circumstances is insufficient); *In re J.M.S.*, 268 N.W.2d 424, 428 (Minn.1978). When a trial court's findings in a termination case are challenged, appellate courts are limited to determining whether the findings address the statutory criteria, whether those findings are supported by substantial evidence, and whether they are clearly erroneous. *In re M.D.O.*, 462 N.W.2d 370, 374–75 (Minn.1990). As in all termination cases, our paramount concern is for the child's best interests. *See id.* at 375.

Hobbs first contends that his consent to termination was improperly induced by illusory promises from the county. Hobbs asserts that open adoption contracts are not enforceable and that voluntary terminations induced by such contracts are invalid.

■ The threshold question is whether Hobbs was actually induced to consent to termination by the alleged promises. The county maintains that the open adoption terms read into the record and referenced in the trial court's findings simply did not induce Hobbs to consent to voluntary termination. We agree.

Based on the record before us, we conclude that the open adoption conditions were gratuities from the county and not the basis for any settlement agreement. With assistance of counsel, Hobbs testified that he clearly understood the finality of his decision to terminate his rights, and Hobbs did *not* testify, when asked, that he decided to consent based on force, coercion, or "any promises" made by others. In fact, questioning about the county's intentions to impose certain open adoption conditions occurred only *after* Hobbs explained why he had decided that termination was in D.D.G.'s best interests. And although the trial court noted in its findings of fact that Hobbs had been "advised" that the county would impose open adoption conditions on D.D.G.'s adoptive parents, the court did not reference these conditions in its conclusions of law or in its order. The apparent informality of the conditions, the sequence of questioning, and Hobbs' own testimony indicate that Hobbs made his decision to consent without inducement from the proposed open adoption conditions. He made his decision based on what he believed to be D.D.G.'s best interests.

■ We again emphasize that there is no legal impediment to *informal* open adoption arrangements made at the time of adoption. *C.H.*, 554 N.W.2d at 741. But whether open adoption arrangements may be *enforced* in court is a different issue. Moreover, the termination of parental rights statute indicates that the legislature intended a clean break in the parent-child relationship at the time of termination. *See* Minn.Stat. § 260.241, subd. 1 ("[A]ll rights, powers, privileges, immunities, duties, and obli-

gations, *including any rights to custody, control, visitation,* or support existing between the child and parent shall be severed and terminated and the parent [whose rights have been terminated] *shall have no standing to appear at any further legal proceeding concerning the child.*" (emphasis added)). Hence, parties should be on notice that while the law does not bar informal open adoption arrangements made at the time of *adoption,* such arrangements should not be made at the time of *termination.*[1]

■ Hobbs next argues that voluntary termination was improper because his consent was not "written." *See* Minn.Stat. § 260.221, subd. 1(a). However, Hobbs raised the written consent issue for the first time on appeal. The argument is therefore waived. *See Thiele v. Stich,* 425 N.W.2d 580, 582 (Minn. 1988); *K.T.,* 327 N.W.2d at 16–17. The gravity of termination proceedings in general is not a sufficient reason to abandon our established rules of appellate argument in this case, especially in light of Hobbs' consent to termination in the trial court, on the record, and with assistance of counsel. Hobbs' interest in the procedural protection of "written" consent is minimal. *Cf. In re C.L.L.,* 310 N.W.2d 555, 557 (Minn.1981) (refusing to consider important constitutional challenges to an involuntary termination order because the arguments were not raised in the trial court).

Hobbs also claims that the record does not support "good cause" for termination of his parental rights, as required by statute. *See* Minn.Stat. § 260.221, subd. 1(a). Assuming that lack of good cause is an adequate reason for vacating a termination order, we find no merit in Hobbs' argument.

■ The trial court's finding of good cause in this case must be upheld if supported by substantial evidence and not clearly erroneous. *K.T.,* 327 N.W.2d at 17. "Good cause" under the voluntary termi-

---

1. Our concern is that even informal open adoption arrangements made at the time of termination will be used primarily as a settlement inducement, rather than an agreement to promote the best interests of the child. We express no opinion, however, regarding the propriety of rescinding a termination order based on inducement through open adoption promises; in that context, the appropriate judicial response is controlled by the facts of each case and, most importantly, by the best interests of the child.

nation statute exists under a variety of circumstances. *Id.* (upholding the trial court's finding of good cause when a 1–year–old child had resided in a foster home since birth; the parent had not visited the child; and the parent did not believe she was able to take care of a second child); *J.M.S.*, 268 N.W.2d at 428 (concluding that good cause existed when the mother determined that it was in the best interests of her child to have two adoptive parents). *Cf. In re Alle*, 304 Minn. 254, 257–58, 230 N.W.2d 574, 576–77 (1975) (holding that good cause did not exist when the parent's sole motivation appeared to be avoiding the financial burden of supporting his adoptive children). Both sides in this case focus their arguments on whether Hobbs was a responsible parent. Our case law indicates, however, that the test is whether Hobbs had sound reasons for consenting at the time of termination—a determination which is not restricted by the existence of cause for *involuntary* termination. *See K.T.*, 327 N.W.2d at 17; *J.M.S.*, 268 N.W.2d at 427 (explaining that good cause for voluntary termination is a personal matter that may be properly based on a variety of facts and circumstances, and that the court's paramount concern should be the best interests of the child).

▪ Hobbs testified that he believed it was best for D.D.G. if Hobbs' rights were terminated so that D.D.G. could enter a stable home with his half-brother, and that it was not fair to make D.D.G. wait years for Hobbs to become able to parent. Hobbs correctly points out that, contrary to the trial court's findings, he did not directly acknowledge at the hearing that his pre-incarceration conduct had harmed D.D.G. Rather, Hobbs acknowledged that parents yelling at each other, hitting each other, using drugs in the home, and being arrested after a "police drug raid" can harm a child. However, Hobbs' stated reasons for consenting to termination are sufficient under *In re K.T.* Moreover, the fact that D.D.G. had already spent 17 months with his grandparents by the time of Hobbs' consent offers good reason to believe—as Hobbs did—that stability for D.D.G. would be served by voluntary termination, which would facilitate expected adoption efforts by the grandparents. Hobbs had good cause to voluntarily consent to the termination of his parental rights.

Finally, Hobbs argues that his consent was not knowing and voluntary. He relies primarily on an affidavit in which he states that he had little time to consult with his attorney; he was incapable of making a rational decision due to the stress of being kept from his prison support groups and programs on the night of May 15, 1995; and he believed that his attorney had negotiated only a "suspension" of his parental rights. The county responds that Hobbs was represented by competent counsel and that he testified that he had sufficient time to decide and understood the ramifications of his decision.

▪ The trial court's findings were not clearly erroneous or lacking in substantial evidence. Most important, Hobbs testified under oath that he understood the finality of his decision; that he was not coerced or pressured to consent; that he was satisfied with his counsel; and that he had enough time to consult with his attorney and to decide to consent. While he was on the stand, his counsel repeatedly inquired as to whether Hobbs understood that he could not change his mind once his consent was given, and at no point during Hobbs' testimony did his counsel state or imply that Hobbs was merely "suspending" his rights. Hobbs' argument that his consent was not knowing is also belied by his testimony that he understood that D.D.G.'s grandparents planned to seek adoption of D.D.G. Based on the record, the trial court had ample evidence to conclude that Hobbs' consent was knowing and voluntary.

For the foregoing reasons, Hobbs' motion to vacate the order terminating his parental rights was properly denied by the trial court.

Reversed.