*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A16-0528**

In the Matter of the Welfare of the Child of:
J. B. and S. N.-J.,
Parents.

**Filed August 8, 2016
Affirmed
Bratvold, Judge**

Benton County District Court
File No. 05-JV-15-2105

Cathleen L. Gabriel, CGW Law office, Annandale, Minnesota (for appellant)

Philip Miller, Benton County Attorney, William V. Faerber, Assistant County Attorney, Foley, Minnesota (for respondent)

Lori Hanson, Waite Park, Minnesota (Guardian ad Litem)


Considered and decided by Peterson, Presiding Judge; Hooten, Judge; and Bratvold, Judge.

## UNPUBLISHED OPINION

**BRATVOLD**, Judge

Appellant L.J.N. challenges the district court's denial of her request for legal and physical custody of her granddaughter, A.T.L.J., following the termination of both biological parents' parental rights. She asserts that the evidence is insufficient to support the district court's order transferring custody of the child to the Commissioner of Human

Services and the corresponding denial of her request for custody. Because the district court's findings on each statutory factor for transfer of custody are supported by substantial evidence, we affirm.

**FACTS**

This appeal arises from the denial of L.J.N.'s motion to be awarded custody of her granddaughter. The child was born in 2004, to S.N.J. (mother) and J.B. (father). L.J.N. is the child's maternal grandmother and has cared for the child since infancy. In 2004, an Arizona court adjudicated the child dependent as to both biological parents. In August 2006, an Arizona court order vested L.J.N. with the child's legal and physical custody. Although the 2006 order transferred guardianship of the child to L.J.N., it did not terminate the parental rights of the child's biological parents because L.J.N. was "not eligible to adopt." L.J.N. and the child later moved to Minnesota and came to the attention of Benton County Human Services (the county).[1]

On December 10, 2014, the county placed the child on a law-enforcement hold after it received a report of the child's maltreatment. The maltreatment report stemmed from L.J.N.'s statements to health-care staff. The district court's summary of the statements was that L.J.N. had thoughts about harming the child, L.J.N. no longer believed she could care for the child, and L.J.N. stated she was "lucky she did not kill [the child]." Health-care staff placed L.J.N. on a psychiatric hold at the St. Cloud Hospital.

---

[1] Social worker Krista Turney testified that L.J.N. had been the subject of six child-protection reports in Minnesota before the child was placed in foster care. These reports, however, were not made part of the record.

2

Following the hold, the county placed the child in foster care and filed a child-in-need-of-protection-or-services (CHIPS) petition, citing "the seriousness of the threat and [L.J.N.'s] past abuse of her own [biological] children." The county became aware that, before assuming parenting duties for the child, L.J.N. lost custody of her four biological children: two involuntarily and two voluntarily. Additionally, the county learned that L.J.N. was charged with domestic assault against her live-in partner in 2014 and was consequently court-ordered to complete an anger assessment and follow any resulting recommendations.

L.J.N. admitted the petition in February 2015. To achieve reunification with the child, the district court ordered L.J.N. to follow a case plan with the following objectives:

1. Complete an anger assessment and follow recommendations with Benton County Human Services being used as a collateral;
2. Participate in individual therapy, to include anger management;
3. Continue to meet with medical doctor regarding medications for mental health and take medications as prescribed;
4. Supervised visits;
5. Cooperate with children's mental health services;
6. Follow all recommendations of [the child's] therapists and/or skills counselors;
7. Remain law abiding and follow all rules of probation;
8. No use of derogatory language regarding [the child] and/or in her presence;
9. Complete parenting classes; and
10. Complete a parental capacity assessment.

The district court conducted review hearings in May, July, and October 2015, when the county announced that it would seek permanent placement of the child. Shortly after, the county filed a petition to terminate the biological parents' rights and to preclude the

child's reunification with L.J.N., "due to concerns about her ability to care for the child." After the county published a notice to the biological parents, the district court held an admit/deny hearing on January 6, 2016. The district court later granted the county's request to enter default judgment against the biological parents, based on their presumptive abandonment of the child. *See* Minn. Stat. § 260C.301, subds. 1(b)(1), 2(a)(1) (2014).

At the court trial on the remaining issue—L.J.N.'s request for permanent legal and physical custody of the child—social worker Krista Turney, psychologist Dr. George Petrangelo, the guardian ad litem, and L.J.N. testified about L.J.N.'s efforts to accomplish her case-plan objectives, among other things. The following summarizes the witness testimony and exhibits.

In the course of assisting L.J.N. with the case plan, several county workers conducted a series of meetings and interviews with L.J.N. and the child, obtaining personal history and information regarding their relationship. L.J.N. told Turney that she had an anger problem that would continue for the rest of her life. L.J.N. also told Turney about an instance of physical abuse against her biological son, stating that she once beat him until he was "bloody and lifeless" and suspected she had killed him. She additionally told social workers that her partner had verbally and physically abused her in the past, and the child had observed the physical abuse at least once.

In the course of the interviews, the child told a social worker that "she would prefer to stay with her foster family until she was old enough or until someone adopted her." The child also stated that L.J.N. "would often state that she would walk out the door and leave her, and once told the child 'Go in your room and die, if I care.'" At one point, L.J.N. told

4

social workers that she was considering dissolving her guardianship of the child, but she later changed her position.

During supervised visits, L.J.N. addressed the child with derogatory and demeaning language, which Turney testified humiliated and embarrassed the child "at a particularly awkward age." According to the case notes, L.J.N. told the child that her biological mother was prepared to resume her care, even though this was not true. Also, Turney testified that L.J.N. told the child she planned to take her to Disneyland, but now would not because of the child-protection case.

Turney, who conducted home visits with L.J.N., testified that L.J.N. was often hostile to her or would ignore her attempts to discuss the case. For example, L.J.N. initially refused to complete a parenting assessment in February 2015 and twice threw papers at Turney in the home, yelling at Turney to leave. L.J.N. also interfered with the county's ability to discuss her progress in individual therapy with her therapist, refusing to sign a full disclosure form and revoking another signed release. At one point, L.J.N. threatened to sue a county social worker if she again mentioned L.J.N.'s previous child-maltreatment cases. Additionally, L.J.N. told other county workers she was unavailable to meet for the entire months of April and May 2015, claiming that she was too busy.

Turney testified that L.J.N. was initially hostile to a county parenting-skills provider, improved in her attitude, and then later resumed hostility. In December 2015, the parenting-skills provider discontinued meetings with L.J.N., explaining that L.J.N.'s hostility made her uncomfortable and that L.J.N. was not practicing any of the parenting skills they had discussed. Also, L.J.N. met and initially complied with an Adult

5

Rehabilitative Mental Health Services (ARMHS) worker, making some changes, but later claimed she was too busy to continue.

L.J.N. completed an anger-management class, but her therapist reported that she did not use any of the skills. Despite recommendations to attend therapy on a weekly basis, L.J.N. attended only sporadically and did not attend at all in the two months before trial. She missed scheduled appointments and appeared to regress in her progress. Although her therapist recommended that L.J.N. stop living with the partner involved in the 2014 domestic dispute, L.J.N. did not find separate housing.

In September 2015, L.J.N. completed a parenting assessment with Dr. Petrangelo, a psychologist. Petrangelo testified that L.J.N. minimized her mental-health and parenting issues by stating she did not need therapy but would cooperate for the sake of the case. According to Petrangelo, L.J.N. was able to identify acceptable parenting skills but was unwilling or unable to put those skills into practice. He concluded that her comments on her relationship and interactions with the child were often disingenuous, noting factual discrepancies between the social workers' observations and L.J.N.'s statements.

After observing supervised visitation and conducting psychological assessments of L.J.N. and the child, Petrangelo opined that "neither [the child] nor [L.J.N.] seem prepared for reunification." The child was unwilling to discuss her relationship with L.J.N. with service providers. Petrangelo observed that the child's "emotional distancing [from L.J.N.] is clearly voluntary and self-preserving." He concluded that L.J.N. is not committed to parenting the child, the child needed much more time to heal from the psychological trauma she had experienced, and it would be harmful to return the child to L.J.N.'s care.

Observers of the supervised visits between the child and L.J.N. noted concerns, such as that the child seemed nonresponsive to L.J.N. and L.J.N. frequently made humiliating comments about the child's lack of hygiene and her menstruation cycle, which made the child visibly uncomfortable. L.J.N. often left the visits early because she was upset. On Saturday, December 12, L.J.N. declined a supervised visit because it was her "birthday weekend."

In sum, Turney, Petrangelo, and the guardian ad litem testified that the child should not be reunified with L.J.N. Each believed that it was in the child's best interests to remain in foster care while the county pursued permanent adoption with a nonrelative.

After detailing more than 30 factual findings, the district court transferred the child's guardianship and legal custody to the Commissioner of Human Services on March 4, 2016, and ordered that the permanency file remain open until an adoption by a nonrelative is completed. L.J.N. now appeals.

## DECISION

### A. Standard of Review

This court reviews a district court's decision to transfer custody to the commissioner and the corresponding denial of a party's request for custody for an abuse of discretion. *See* Minn. Stat. §§ 260C.513(a) (2014) (providing that the district court may transfer guardianship to a suitable and fit relative), 645.44, subd. 15 (2014) ("'May' is permissive"); *In re Welfare of Child of D.L.D.*, 865 N.W.2d 315, 318 (Minn. App. 2015) (providing that this court reviews a district court's decision to transfer permanent custody for abuse of discretion), *review denied* (Minn. July 21, 2015). On appeal from a decision terminating

7

parental rights, "appellate courts are limited to determining whether the findings address the statutory criteria, whether those findings are supported by substantial evidence, and whether they are clearly erroneous." *In re Welfare of D.D.G.*, 558 N.W.2d 481, 484 (Minn. 1997). A finding is clearly erroneous if it is "manifestly contrary to the weight of the evidence or not reasonably supported by the evidence as a whole." *In re Children of T.R.*, 750 N.W.2d 656, 660-61 (Minn. 2008) (quotation omitted). The district court's findings must conform to the statutory requirements. *In re Welfare of Chosa,* 290 N.W.2d 766, 769 (Minn.1980). "Considerable deference is due to the district court's decision because a district court is in a superior position to assess the credibility of witnesses." *In re Welfare of L.A.F.*, 554 N.W.2d 393, 396 (Minn. 1996).

### B. Termination of Parental Rights

District courts may order involuntary termination of parental rights on the basis of one or more of the nine criteria listed in Minn. Stat. § 260C.301, subd. 1(b), including abandonment. When the parents have not had regular contact with the child and have not "demonstrated consistent interest in the child's well-being for six months" despite the social services agency's reasonable efforts to facilitate contact, a statutory presumption of abandonment applies. *Id.*, subd. 2(a). Here, the termination proceeding first addressed the parental rights of the child's biological parents, who relinquished care of the child to L.J.N. in 2006.[2] L.J.N. intervened in the juvenile-protection matter as of right, under Minn. R. Juv. Prot. P. 23.01, subd. 2.

---

[2] The district court noted that neither party addressed the legal significance of the 2006 Arizona court order appointing L.J.N. as the permanent guardian. Even presuming the

The district court concluded that clear and convincing evidence established that the child's mother and father had abandoned her. It noted that the parents had not communicated with the child or the county for the duration of the case, about 14 months, if not longer, despite the county's "numerous unsuccessful attempts to locate and contact" them.[3] After finding that the evidence showed "that both parents have deserted the child and intend to forsake the duties of parenthood," the district court concluded that clear and convincing evidence showed that it was in the child's best interest to terminate the parental rights of both biological parents. The district court's decision to terminate the biological parents' rights has not been challenged on appeal.

## C. Guardianship

Once a district court terminates both biological parents' parental rights, it "*shall* order the guardianship of the child to: (1) the commissioner of human services; (2) a licensed child-placing agency; or (3) an individual who is willing and capable of assuming the appropriate duties and responsibilities to the child." Minn. Stat. § 260C.325, subd. 1(a) (2014) (emphasis added). Under Minn. Stat. § 260C.513(a) (2014),

> Termination of parental rights and adoption, or guardianship to the commissioner of human services through a

---

validity of the Arizona court order, the district court "may, after notice to the parties and a hearing, remove the guardian appointed by the juvenile court and appoint a new guardian" comporting with statutory requirements. Minn. Stat. § 260C.328(a) (2014).

[3] The district court noted that the county had attempted to contact the parents through the Arizona Department of Child Safety, to no avail. On December 17, 2015, the Arizona Department of Child Safety informed the county that it had opened a file regarding the child's mother, S.N.J., "after she was found passed out behind the wheel of a car with her infant son in the back seat." S.N.J. was incarcerated, her infant son was placed in protective care, and S.N.J.'s visitation rights to the infant were later terminated. S.N.J.'s whereabouts were unknown at the time of trial.

9

consent to adopt, are preferred permanency options for a child who cannot return home. If the court finds that termination of parental rights and guardianship to the commissioner is not in the child's best interests, the court may transfer permanent legal and physical custody of the child to a relative when that order is in the child's best interests.

*See also* Minn. Stat. § 260C.515, subd. 4 (2014) (providing that the district court "may order permanent legal and physical custody to a fit and willing relative in the best interests of the child" consistent with certain statutory requirements). "Best interests of the child" means "all relevant factors to be considered and evaluated." Minn. Stat. § 260C.511(a) (2014); *see In re Welfare of Children of J.R.B.*, 805 N.W.2d 895, 905 (Minn. App. 2011) ("In analyzing a child's best interests, the court must balance three factors: (1) the child's interest in preserving the parent-child relationship; (2) the parent's interest in preserving the parent-child relationship; and (3) any competing interest of the child."(quotations omitted)), *review denied* (Minn. Jan. 6, 2012).

A district court's order that permanently places a child out of a parent's home must include the following detailed findings:

> (1) how the child's best interests are served by the order;
> (2) the nature and extent of the responsible social services agency's reasonable efforts or, in the case of an Indian child, active efforts to reunify the child with the parent or guardian where reasonable efforts are required;
> (3) the parent's or parents' efforts and ability to use services to correct the conditions which led to the out-of-home placement; and
> (4) that the conditions which led to the out-of-home placement have not been corrected so that the child can safely return home.

Minn. Stat. § 260C.517(a) (2014).

*D. Analysis*

L.J.N. challenges the district court's denial of her request for permanent legal and physical custody of the child, arguing that the evidence is insufficient to support its order transferring permanent custody to the commissioner. We address each challenge to the district court's findings in turn.

### 1. Best-Interests Findings

L.J.N. maintains that the district court's best-interests findings were inadequate because they were generalizations and improperly concentrated on L.J.N.'s past child-protection cases.

The district court interspersed its assessment of the child's best interests throughout its findings. The district court noted reports that L.J.N. had previously lost custody of her own four biological children, her disclosure that she had once severely abused her son, and the charge alleging that she was involved in a 2014 domestic assault against her partner. The district court also addressed L.J.N.'s derogatory and demeaning language toward the child, concluding that it "evince[d] a cruelty that further shows [L.J.N.'s] failure to absorb any of the proper parenting skills that she was required to attain as part of the case plan, and her unreadiness to be a healthy caretaker for the child." While the district court noted that L.J.N. "attempted to cast these statements in a more endearing light," it determined that her testimony was not credible.

The district court also relied on Petrangelo's testimony—which it found "credible and persuasive"—and noted that Petrangelo opined that reunification would be harmful to the child. The district court additionally summarized the opinions of social worker Turney

and the guardian ad litem, each of whom opined that L.J.N. was not a suitable placement option and that nonrelative adoption was in the child's best interests. The district court further noted the child's progress while in foster care, as reported by the county.

The district court also considered L.J.N.'s testimony in weighing the child's best interests, noting that L.J.N. "faces many significant mental and physical health issues that she struggles with to the extent that they negatively impact her ability to nurture the child." It noted that L.J.N. wavered in her "desire to continue to parent" the child throughout the case.

Summarizing these considerations in terms of the child's best interests, the district court stated:

> The Court finds that it is [in] the best interests of the child that parental rights be terminated and she remain in foster care until she can be adopted by a nonrelative. The interests of her biological parents and the desire of her grandmother to continue to care for the child are outweighed by the child's need for a stable, loving and nurturing home that is free from verbal and physical abuse. The benefits [the child] would receive from adoption outweigh the detriment to her parents and grandmother from termination of parental rights.

Contrary to L.J.N.'s argument, the district court's findings reveal no improper focus on her previous involvement with child-protection services. To the contrary, mention of her previous terminations occupies one paragraph of the district court's seven pages of findings. Nor do the best-interest findings amount to generalizations when viewed in the context of the entire order. The district court's findings were presented chronologically, with findings relevant to the child's best interests appearing throughout. Our review of the record shows ample support for the district court's findings, and we owe "[c]onsiderable

deference" to its credibility determinations, *L.A.F.*, 554 N.W.2d at 396. We conclude, therefore, that the district court's best-interests findings are supported by substantial evidence and are not clearly erroneous.

## 2. Reunification Efforts

Regarding the district court's reunification findings, L.J.N. asserts that the county "failed to timely create or file a case plan," failed to show that it expended reasonable efforts to reunify her with the child, and incorrectly focused on the child's biological parents.

L.J.N. is correct that the county did not timely create a case plan. After the child was removed from L.J.N.'s care on December 10, 2014, the county should have filed a case plan with the court within 30 days, or by January 9, 2015. *See* Minn. Stat. § 260C.212, subd. 1(a) (2014). The record contains none of the case plans associated with this case and does not indicate whether a case plan was filed earlier than April 28, 2015. Any potential prejudice towards L.J.N. because of an untimely case plan was minimized by the district court's extension of the permanency timelines in response to the county's request. *Cf. In the Matter of the Welfare of R.M.M.*, 316 N.W.2d 538, 542 (Minn. 1982) (finding that, although a written case plan "is required in every case," lack of a case plan does not necessarily warrant reversal of termination of parental rights). Here, it is undisputed that L.J.N. understood what was expected of her to achieve reunification with the child, and the extension allowed her more time to achieve stable housing, which was one objective of the case plan.

Regarding the county's reasonable efforts, the district court's order thoroughly reviewed the evidence regarding services offered by the county, L.J.N.'s interactions with the county, and her compliance with the case plan. The county referred L.J.N. to a mental-health-services worker, provided case-management services, facilitated a psychological assessment, provided in-home parenting-skills training, facilitated a parental-capacity assessment, and provided for individual therapy. The county also supervised L.J.N.'s visits with the child.

The record shows that L.J.N. actively frustrated many of these efforts. For example, she refused a supervised visit in December 2015; frequently rescheduled appointments with her mental-health-services worker and refused to meet at all with her mental-health-services worker in January 2016, stating that she was "completely busy;" was often uncooperative with the county social worker; delayed a psychological assessment for five months after the date it was recommended; created a hostile environment in her home, deterring at least one county skills worker from returning to her home; informed Petrangelo that she believed she did not need individual therapy; and did not follow the recommended frequency of therapy visits.

Regarding the district court's focus on the biological parents, L.J.N. is correct that she has important rights as a grandparent with whom the child has lived for many years. *See* Minn. Stat. § 260C.163, subd. 2 (2014) ("Any grandparent of the child has a right to participate in the proceedings to the same extent as a parent, if the child has lived with the grandparent within the two years preceding the filing of the petition."). Our review of the district court's order and the record shows that L.J.N. was treated appropriately. The district

14

court's order first considered the child's abandonment by her biological parents, which was sufficient to terminate *their* parental rights, and then examined L.J.N.'s fitness for the child's guardianship. The record contains no indication that the court imputed to L.J.N. anything less than parental status regarding the child.

Accordingly, substantial evidence supports the district court's finding that the county exerted reasonable efforts and the district court's finding is not clearly erroneous.

### 3. Efforts to Correct the Conditions Leading to the Out-of-Home Placement

L.J.N. next asserts that her "significant progress" on the case plan shows she corrected the conditions leading to the out-of-home placement. She does not specify how the district court erred in its findings of fact or conclusions of law.

Regarding L.J.N.'s efforts on the case plan, the district court identified the objectives that she had achieved. Specifically, L.J.N. met with her case manager, completed an anger assessment, attended personal therapy to some extent, met with a parenting-skills worker and a mental-health-services worker, completed a parenting assessment, and participated in supervised visits with the child.[4]

Despite L.J.N.'s efforts, however, the district court found that she was frequently uncooperative with the case manager, failed to implement the skills she was taught during anger assessments and parenting visits, discontinued personal therapy against therapist

---

[4] Additionally, the trial testimony showed she remained law abiding, continued to take her prescribed medication, and abstained from substance use.

recommendations, had not attended the recommended dialectical behavior therapy, and was uncooperative with the county service providers in her home.

The district court additionally made determinations regarding L.J.N.'s credibility, to which we defer. *See L.A.F.*, 554 N.W.2d at 396. The district court summarized L.J.N.'s testimony, in which she "conceded that many of the concerns about her parenting skills were valid, but stated that she is a different person now, and that she would parent differently due to her participation in therapy." The district court found that L.J.N.'s promises were insufficient, however, because she

> was unable to satisfactorily explain . . . why the therapy in which she had engaged for approximately one year prior to the initiation of this case failed to have a beneficial impact on her parenting skills, or why she was choosing to engage in other personal activities over the more recent months, rather than attending biweekly therapy sessions as recommended.

The district court also considered L.J.N.'s testimony that her own medical appointments often kept her from accomplishing the case-plan objectives. The district court "question[ed] whether [L.J.N.'s] lack of attention to several aspects of her case plan has been due to pressing health concerns or simply her desire to do other things. The facts presented do not show a legitimate reason for [L.J.N.'s] failure to attend weekly or biweekly therapy."

The district court thoroughly reviewed L.J.N.'s engagement with the case plan objectives, L.J.N.'s explanations, and her failure to follow recommendations from service providers. The district court's findings regarding L.J.N.'s efforts to correct the conditions

16

leading to the out-of-home placement are not clearly erroneous and are supported by substantial evidence.

### 4. Correction of the Conditions Leading to the Out-of-Home Placement

Finally, L.J.N. asserts that the district court erred in its findings because "[t]he conditions that led to the out-of-home placement plan are almost entirely corrected."

Again, the district court's findings regarding correction of the conditions appear throughout its summary of the testimony and record evidence. The petition explains the conditions leading to the child's out-of-home placement, stating that the child was removed from L.J.N.'s care "after a report came in that [she] threatened to harm the child in a therapy session. Due to the seriousness of the threat and [her] past abuse of her own children, the child was placed in foster care." Several objectives of L.J.N.'s case plan highlight the county's attempted remedy for the conditions leading to the child's placement in foster care: completion of an anger assessment and related recommendations to seek the county's assistance; participation in individual therapy, including anger management; continuing medication for her mental-health concerns; supervised visits; cooperation with the child's therapist; remaining law abiding and cooperating with the probation department; abstaining from the use of derogatory language toward the child; completion of a parenting assessment; and completion of parenting classes.

The district court's findings confirm L.J.N.'s compliance with some case-plan objectives, as discussed above, but they belie her argument that the conditions were "almost entirely corrected." Critically, the district court noted her therapist's opinion that L.J.N. had not implemented any of the anger-management skills she was taught and she appeared

to be regressing in her therapy progress; the social worker's opinion that she was not using any of the parenting skills taught by the county; and that, at the time of trial, she continued to live with the partner with whom she was involved in the 2014 domestic dispute.

Most notably, the district court found that L.J.N. had not corrected the issue directly leading to the child's placement in foster care: her derogatory and emotionally harmful treatment of the child. Supervisors observed that the child was "non-responsive to her grandmother" and L.J.N. typically did not participate in activities with the child during supervised visits. The district court's findings establish that the conditions leading to the child's out-of-home placement were not corrected. These findings are supported by the record and are not clearly erroneous.

In sum, the district court's findings satisfied the statutory criteria, *see* Minn. Stat. § 260C.517(a), and are supported by substantial evidence. Accordingly, the district court did not abuse its discretion by transferring permanent legal and physical custody of the child to the commissioner and denying L.J.N.'s request.

**Affirmed.**