*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A16-1016**

In the Matter of the Welfare of the Child of: C.F., Parent

**Filed November 14, 2016
Affirmed
Hooten, Judge**

Hennepin County District Court
File No. 27-JV-16-308

Mary F. Moriarty, Hennepin County Public Defender, Peter W. Gorman, Assistant Public Defender, Office of the 4th District Public Defender-Hennepin County, Minneapolis, Minnesota (for appellant C.F.)

Michael O. Freeman, Hennepin County Attorney, Cory A. Carlson, Assistant County Attorney, Minneapolis, Minnesota (for respondent Hennepin County Human Services and Public Health Department)

Shirley A. Reider, St. Paul, Minnesota (for respondent Guardian ad Litem)

Considered and decided by Halbrooks, Presiding Judge; Rodenberg, Judge; and Hooten, Judge.

## UNPUBLISHED OPINION

**HOOTEN**, Judge

In this proceeding to terminate appellant-mother's parental rights, appellant argues that the district court should have allowed her to withdraw her voluntary termination of her parental rights. We affirm.

## FACTS

On September 10, 2008, appellant C.F. voluntarily terminated her rights to her first child. C.F. gave birth to her second child, S.Z., on January 8, 2015. Soon after S.Z.'s birth, respondent Hennepin County Human Services and Public Health (the county) filed a petition alleging that S.Z. was born ten weeks premature, had been prenatally exposed to methadone, methamphetamine, and morphine, and was a child in need of protection or services (CHIPS). The district court adjudicated S.Z. as CHIPS on March 5, 2015, and placed her in foster care, where she remains. At the time of the CHIPS adjudication, C.F. was ordered to complete a case plan to correct the conditions leading to the placement of S.Z. in foster care. The case plan included chemical dependency and mental health assessments, any recommended treatment resulting from those assessments, domestic violence programming, and visitation with S.Z.

Although C.F. made efforts to comply with much of her case plan, she did not substantially comply with her chemical dependency treatment program. C.F. enrolled in both inpatient and outpatient chemical dependency treatment programs, but she was ultimately unable to control her chemical dependency issues. Over the course of her case plan, C.F. missed scheduled urinalysis tests, had multiple positive urinalysis tests, and failed to cooperate in setting up a random urinalysis testing schedule. Although S.Z. was returned to C.F.'s care, she was returned to foster care after a short period of time due to concerns that C.F. was unable to adequately care for S.Z. because of C.F.'s misuse of prescribed medications.

In January 2016, the county filed a petition to terminate the parental rights of C.F. and P.Z., S.Z.'s father, and trial was scheduled for April 2016. On what would have been the first day of trial, after being sworn in, the parents waived their right to trial and agreed to the voluntary termination of their parental rights. Both parents signed affidavits affirming that no one had coerced or pressured them into voluntarily terminating their parental rights.

C.F. stated on the record at the hearing that she was agreeing to a voluntary termination because she had a history of mental health issues, with which she was still struggling. At the hearing, she agreed that she had discussed her decision with her attorney and that, even though she was on medications, the medications did not affect her "ability to think clearly or to understand the proceedings." C.F. agreed that she was neither able to act as a parent at the time of her voluntary termination nor did she expect that she would be able to parent at any time in the near future. She also agreed that her voluntary termination of her parental rights was in the best interests of S.Z. Based on the waiver of trial and the testimony of both parents, the district court filed an order terminating both parents' rights on April 29, 2016.

On June 1, 2016, C.F. filed a motion to withdraw her voluntary termination, arguing that she was "emotional and scared at trial and mistakenly misunderstood the consequence of an involuntary termination." The district court denied C.F.'s motion on June 9, 2016. C.F. appeals.

**D E C I S I O N**

C.F. challenges the district court's denial of her motion under Minn. R. Juv. Prot. P. 46.02 to withdraw her voluntary termination of parental rights because her agreement was not intelligent or voluntary. On appeal of a denial of a motion to withdraw a voluntary termination, our review is limited to determining whether the district court's findings are supported by substantial evidence, address the proper criteria and whether those findings are clearly erroneous. *In re Welfare of D.D.G.*, 558 N.W.2d 481, 484 (Minn. 1997); *see In re Welfare of Child of J.L.L.*, 801 N.W.2d 405, 411 (Minn. App. 2011) (reviewing district court's decision to allow parent to withdraw voluntary termination of parental rights for abuse of discretion), *review denied* (Minn. July 28, 2011).[1] The parent bears the burden of showing a "serious and compelling reason" to justify "once again uproot[ing] the child." *In re Welfare of K.T.*, 327 N.W.2d 13, 18 (Minn. 1982). A parent's change of mind or circumstances is not sufficient. *Id.* In determining whether to withdraw a voluntary termination, the child's best interests are the paramount concern. *D.D.G.*, 558 N.W.2d at 484.

C.F. presents two grounds for withdrawing her voluntary termination: her incorrect understanding of the legal consequences of an involuntary termination of parental rights and her mental illness. C.F. specifically asserts that she was led to understand that if she proceeded with an involuntary termination trial and lost, the state would take any children

---

[1] The county argues that a voluntary termination may be withdrawn *only* upon a showing of undue influence, duress, or fraud. However, the plain text of Minn. R. Juv. Prot. P. 46.02 allows a district court to grant relief for a number of reasons, including "mistake, inadvertence, surprise, or excusable neglect."

subsequently born to her, that she would not be able to contest the presumption that she was palpably unfit, and that she would never be allowed to have a family again by operation of law.[2]  However, before the district court and on appeal, C.F. has neither expanded on this statement, nor identified the source of this misunderstanding.

In denying appellant's motion to withdraw the voluntary termination of her parental rights, the district court noted that C.F. had the burden of showing a serious and compelling reason to withdraw the voluntary termination.  As C.F.'s motion was not supported by a memorandum of law or affidavit, was not argued, and the motion itself was a mere seven sentences, the district court looked primarily to C.F.'s testimony during the voluntary termination proceeding in determining whether she met her burden of proof.

C.F. was represented by counsel at all points during the termination process, and the district court observed that C.F. had "ample opportunity during the five months preceding the trial and during the morning of the trial to question her attorney if she did not understand her legal rights."  The district court acknowledged that C.F.'s misunderstanding of the consequences of an involuntary termination was a mistake, but found that mistake was not a sufficiently compelling reason to withdraw the voluntary termination in light of C.F.'s

---

[2] We note that an *involuntary* termination of parental rights creates a statutory presumption that the parent is unfit, and we appreciate the severe consequences this presumption has on the ability of a parent to assert parental rights on later born children.  *See* Minn. Stat. § 260C.301, subd. 1(b)(4) (2014) ("It is presumed that a parent is palpably unfit to be a party to the parent and child relationship upon a showing that the parent's parental rights to one or more other children were involuntarily terminated.").  However, this presumption is "easily rebuttable" and may be defeated if a parent introduces sufficient evidence to "justify a finding of fact that the parent is not palpably unfit." *In re Welfare of R.D.L.*, 853 N.W.2d 127, 137 (Minn. 2014) (alteration omitted) (quotations omitted).

multiple statements during the termination hearing that she understood her rights and a termination was in the best interests of S.Z.

As to C.F.'s second ground for withdrawing her voluntary termination, we note that C.F. did not raise her mental illness as a reason for withdrawing the voluntary termination and has arguably forfeited that argument on appeal. *See D.D.G.*, 558 N.W.2d at 485 (determining that "[t]he gravity of termination proceedings in general is not a sufficient reason to abandon our established rules of appellate argument" that issues not previously raised are forfeited). However, the district court nonetheless addressed C.F.'s mental illness in its order, noting that C.F. provided no additional information regarding her mental illness or how it interfered with her ability to agree to a voluntary termination of her parental rights several weeks earlier.

The record supports the district court's conclusions. Although C.F. alludes to her concern about her parental rights to future children, C.F. fails to offer any explanation of the link between her mental illness and her decision to not risk an involuntary termination of her parental rights after a trial, in which she would be presumed unfit to parent any future children, as opposed to her voluntary termination, in which there would be no presumption of her unfitness to parent future children. Moreover, there is nothing in the record that would contradict her testimony at the time of her voluntary termination that her mental illness, and the medications that she was taking, did not affect her ability to think clearly or to understand the proceedings.

More significantly, in her motion to withdraw her voluntary termination, appellant failed to present a serious and compelling reason why S.Z., who has been in foster care for

6

almost her entire life, should be uprooted again. As we have noted, timeliness is of the utmost importance in a termination of parental rights case because "each delay in the termination of a parent's rights equates to a delay in a child's opportunity to have a permanent home." *In re Welfare of Child of T.C.M.*, 758 N.W.2d 340, 345 (Minn. App. 2008) (alteration omitted). At the time of C.F.'s motion, S.Z. had been in foster care for 17 months.

The district court is required to "commence permanent placement determination proceedings to determine the permanent status of the child" and "complete an admit/deny hearing" no later than 12 months after the child is placed in foster care. Minn. R. Juv. Prot. P. 42.01, subd. 5(b) & 42.04(b). The trial upon the petition to terminate parental rights is to "commence within sixty (60) days of the first scheduled admit/deny hearing" and "concluded within thirty (30) days from the date of commencement of the trial." Minn. R. Juv. Prot. P. 39.02, subd. 1(c). The district court must "issue its findings and order regarding whether one or more statutory grounds set forth in the petition have been proved . . . [w]ithin fifteen (15) days of the conclusion" of the trial, or within "an additional fifteen (15) days if the court finds that an extension of time is required in the interests of justice and the best interests of the child." Minn. R. Juv. Prot. P. 39.05, subd. 1. Under these timelines, the district court would have been required to issue its order determining the petition for termination weeks before C.F. brought her motion to withdraw her voluntary termination.

During her voluntary termination hearing six weeks earlier, C.F. agreed that, because of her mental illness, she was unable to act as a parent at that time nor would she

7

be able to parent at any time in the near future. She also agreed that her voluntary termination of her parental rights was in the best interests of S.Z. In her motion to withdraw her voluntary termination, C.F. did not present any evidence to the district court that contradicted her prior testimony regarding her inability to parent S.Z. Nor did she present any arguments why it was in the best interests of her child to be uprooted in contravention of the juvenile protection rules and statutes mandating the timely determination of S.Z.'s permanent placement.

In denying C.F.'s motion, the district court observed that all parties, including C.F. through her testimony at the termination trial, supported termination of C.F.'s parental rights and agreed that such termination was in the best interests of S.Z. C.F. failed to show that there was a serious and compelling reason to uproot S.Z. from her foster home or that there was any change in her ability to parent S.Z. And, she failed to show why the district court's granting of her motion, in contravention of the timelines set forth under the juvenile protection rules and statutes, was in the best interests of S.Z. *See* Minn. Stat. § 260C.301, subd. 7 (2014) (stating that "[w]here the interests of the parent and child conflict, the interests of the child are paramount."). Based upon this record, and in recognition of the strong policy favoring the timely determination of a permanent placement as being in the best interests of S.Z., we conclude that the district court did not abuse its discretion in denying C.F.'s motion to withdraw her voluntary termination.

**Affirmed.**